IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 3:12-CV-893-D |
| | § | |
| $229,590.00 in United States Currency | § | |
| Seized from a Safe in the Home of | § | |
| Dallas County Commissioner | § | |
| John Wiley Price | § | |
| | § | |
| $230,763.47 from Dallas County | § | |
| Commissioner John Wiley Price's Sale | § | |
| Of 7001 Grady Niblo Road, | § | |
| Dallas, Texas | § | |
| | § | |
| *Claimant in Rem.* | § | |

## ORIGINAL ANSWER TO FIRST AMENDED COMPLAINT FOR FORFEITURE *IN REM*

**To the Honorable United States Judge of Said Court:**

COMES NOW, Claimant, John Wiley Price, by and through undersigned counsel, and respectfully files this Original Answer to the Government's First Amended Original Complaint for Forfeiture *In Rem*, and thus would answer as follows and, except as specifically admitted below, deny each and every allegation of the Government's claims:

## Statutory Basis for the Action

1.    Claimant John Wiley Price responds that the allegations contained in paragraph 1 of the Government's First Amended Complaint are such to which no responsive pleading is necessary. To the extent a response is required, Claimant is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 1 of the Government's First Amended Complaint and, therefore, denies same.

## Jurisdiction and Venue

2.    Claimant John Wiley Price admits the allegations contained in Paragraph 2 of the Government's First Amended Complaint.

3.    Claimant John Wiley Price admits the allegations contained in Paragraph 3 of the Government's First Amended Complaint.

4.    Claimant John Wiley Price admits the allegations contained in Paragraph 4 of the Government's First Amended Complaint.

## The Defendants In Rem

5.    Claimant John Wiley Price admits that various money was seized; however, with respect to the remaining allegations, Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 5 (and all subparts) of the Government's First Amended Complaint and, therefore, denies same.

6.    Claimant John Wiley Price admits that various money was seized; however, with respect to the remaining allegations, Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 6 (and all subparts) of the Government's First Amended Complaint and, therefore, denies same.

7.    Claimant John Wiley Price admits that various money was seized; however, with respect to the remaining allegations, Claimant John wile Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 7 of the Government's First Amended Complaint and, therefore, denies same.

8.    Claimant John Wiley Price admits that various money was seized; however, with respect to the remaining allegations, Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 8 of the Government's First Amended Complaint and, therefore, denies same.

## Administrative Forfeiture

### The $229,590.00

9.    Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 9 of the Government's First Amended Complaint and, therefore, denies same.

10.   Claimant John Wiley Price admits the allegation contained in Paragraph 10 of the Government's First Amended Complaint to the extent they involve Claimant Price.  Claimant Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 10 as to Claimant Fain.

11. Claimant John Wiley Price admits the allegation contained in Paragraph 11 of the Government's First Amended Complaint.

12. Claimant John Wiley Price admits the allegation contained in Paragraph 12 of the Government's First Amended Complaint.

13. Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 13 of the Government's First Amended Complaint and, therefore denies the same.

### Extension of the $229,590.00 Civil Forfeiture Filing Date

14. Claimant John Wiley Price admits the allegations contained in Paragraph 14 of the Government's First Amended Complaint.

15. Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 15 of the Government's First Amended Complaint and, therefore denies the same.

16. Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 16 of the Government's First Amended Complaint and, therefore denies the same.

17. Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 17 of the Government's First Amended Complaint and, therefore denies the same.

18. Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 18 of the Government's First Amended Complaint and, therefore denies the same.

## $230,763.47 from the Sale of 7001 Grady Niblo Road

### a. The $50,000.00

19.   Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 19 of the Government's First Amended Complaint and, therefore denies the same.

20.   Claimant John Wiley Price admits the first sentence in Paragraph; however, is without sufficient knowledge to either admit or deny the allegations contained in the last sentence of Paragraph 20 of the Government's First Amended Complaint and, therefore, denies same.

21.   Claimant John Wiley Price admits the allegations contained in Paragraph 21 of the Government's First Amended Complaint.

22.   Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 22 of the Government's First Amended Complaint and, therefore, denies the same.

### b. The $180,763.47

23.   Claimant John Wiley Price is without sufficient knowledge to either admit or deny the allegations contained in Paragraph 23 of the Government's First Amended Complaint and, therefore, denies same.

24.   Claimant John Wiley Price admits the first sentence in Paragraph 24; however, is without sufficient knowledge to either admit or deny the remaining

allegations contained in Paragraph 24 of the Government's First Amended Complaint and, therefore, denies same.

25.   Claimant John Wiley Price denies the allegations contained in Paragraph 25 of the Government's First Amended Complaint.

## Basis for Forfeiture

26.   Claimant John Wiley Price denies the allegations contained in Paragraph 26 of the Government's First Amended Complaint.

27.   Claimant John Wiley Price denies the allegations contained in Paragraph 27 of the Government's First Amended Complaint.

## Facts Supporting a Reasonable Belief for Forfeiture

28.   Claimant John Wiley Price denies the allegations contained in Paragraph 28 of the Government's First Amended Complaint

## Supporting Affidavit:

## Facts Supporting Forfeiture

## The Seizure of the $229,590.00

1.   On June 27, 2011, at approximately 9 a.m., FBI agents executed a search warrant at 510 E. 5th Street in Dallas County, Dallas, Texas.

> **Response:** Claimant Price admits that a search was conducted but is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

2.      510 E. 5th Street in Dallas County, Dallas, Texas is the primary residence of John Wiley Price who is the sole resident there.

**Response:** Claimant Price admits the allegations in Paragraph 2 above.

3.      Within the house, agents located a safe containing $229,590.00 in United States currency.

> **Response:** Claimant Price admits that a search was conducted but is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

4.      The safe also contained jewelry and numerous expensive watches with brands such as Jacob & Co., Icelink, Breitling, Marc Jacobs, Versace, Chanel, Corum Boutique, Cartier, Rolex, Technolex, Glashutte, Philip Stein, Le Vian, and Joe Rodeo.

> **Response:** Claimant Price admits the allegations contained in Paragraph 4 above.

5.      Both the cash and the watches were seized as evidence and the cash was referred for administrative forfeiture proceedings.

> **Response:** Claimant Price admits that a search was conducted but is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

## The Seizure of the $230,763.47

6.      On December 19, 2011, FBI agents executed a federal seizure warrant at 2450 North I-35E in Lancaster, Texas to obtain a $50,000.00 payment from W.O. Henry to John Wiley Price after Price appeared to close on a sale of 7001 Grady Niblo Road, Dallas, Texas to Henry.

> **Response:** Claimant Price admits that a search was conducted but is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

7.      Republic Title later ordered a revised closing on the 7001 Grady Niblo property when it learned of monies that Price and Henry had negotiated outside of their closing.

> **Response:** Claimant Price denies the allegations in Paragraph 7 above.

8.      As part of the revised closing, all undisclosed purchase monies had to be wired to the title company prior to the revised closing.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 8 above and, therefore, denies same.

9.      On March 18, 2012, FBI agents served a seizure warrant on Republic Title for all proceeds due to John Wiley Price from the sale of the 7001 Grady Niblo property.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 9 above and, therefore, denies same.

10.    The prior $50,000.00 remained seized and additional funds of $180,763.47 were seized on March 23, 2012 from Republic Title at 2626 Howell Street, Dallas, Texas 75204.

> **Response:** Claimant Price admits that a search and seizure was conducted but is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

## Administrative Forfeiture

11.    The FBI initiated administrative forfeiture proceedings against the $229,590.00 in United States currency seized from a safe in the home of Dallas County Commissioner John Wiley Price.

> **Response:** Claimant Price admits the allegations in Paragraph 11 above.

12.    On August 25, 2011, a notice of the administrative forfeiture stating the exact amount of money seized from the safe was sent to Price, his attorney William M. Ravkind, Dapheny Fain and her attorney Tom Mills.  The notices to Price and Fain were unclaimed.

> **Response:** Claimant Price admits the allegations asserted in Paragraph 12 above as related to Price and his attorney, William M. Ravkind, however, is without sufficient knowledge to either admit or deny the allegations asserted as to Dapheny Fain and her attorney, Tom Mills.

13.    On September 27, 2011, John Wiley Price filed a claim, under oath, in the administrative forfeiture proceedings whereby he claimed ownership of $115,000.00 of the $229,590.00.

**Response:** Claimant Price admits the allegations asserted in Paragraph 13 above.

14.   Price also claimed an interest in the remaining $114,590.00 but purported to be merely a "custodian" of those funds for Dapheny E. Fain. He asserted that Dapheny Fain would file a separate administrative claim.

**Response:** Claimant Price admits the allegations contained in Paragraph 14 above.

15.   Accompanying Price's administrative claim was a letter from his attorney William M. Ravkind with various banking records.

**Response:** Claimant Price admits the allegations contained in Paragraph 15 above.

16.   As Price's legally authorized agent, Mr. Ravkind claimed in the letter that the $229,590.00 resulted from various cash withdrawals and loan proceeds some of which were contained in the banking records and constituted "the assets of legitimate businesses and business activity."

**Response:** Claimant Price admits the allegations contained in Paragraph 16 above.

17.   On September 28, 2011, Dapheny E. Fain also filed an administrative claim in which she recited, under oath, Price's claim that she owned $114,590.00 of the funds in the safe.

**Response:** Claimant Price admits the allegations contained in Paragraph 17 above.

18. Fain asserted that the $114,590.00 she claimed represented "the legal proceeds of my business."

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

19. Once the FBI received these claims, the administrative forfeiture proceedings were ended against the $229,590.00 and the claim was forwarded to the United States Attorney's Office in the Northern District of Texas for the judicial forfeiture process.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

20. The FBI later initiated administrative forfeiture proceedings against the $50,000.00 from Dallas County Commissioner John Wiley Price's sale of 7001 Grady Niblo Road, Dallas Texas.

> **Response:** Claimant Price admits the allegations contained in Paragraph 20 above.

21. On February 16, 2012, a notice of the administrative forfeiture was sent to Price, his attorney William M. Ravkind, and Henry Building Incorporated.

> **Response:** Claimant Price admits that Price and his attorney received a notice of the administrative forfeiture; however, is without sufficient knowledge to either admit or deny the allegations as to Henry Building Incorporated asserted in Paragraph 21 above and, therefore, denies same.

22.    On March 22, 2012, John Wiley Price filed a claim, under oath, in the administrative forfeiture proceedings whereby he claimed ownership of the $50,000.00.

>    **Response:**  Claimant Price admits the allegations contained in Paragraph
>    22 above.

23.    The FBI then ended the administrative forfeiture proceedings against the $50,000.00 and the claim was forwarded to the United States Attorney's Office in the Northern District of Texas for the judicial forfeiture process.

>    **Response:**  Claimant Price admits the allegations contained in Paragraph
>    23 above.

24.    The FBI also initiated administrative forfeiture proceedings against the $180,763.47 from Dallas County Commissioner John Wiley Price's sale of 7001 Grady Niblo Road, Dallas Texas.

>    **Response:**  Claimant Price admits the allegations contained in Paragraph
>    24 above.

25.    On April 27, 2012, a notice of the administrative forfeiture was sent to Price, William M. Ravkind, Henry Building Incorporated, its attorney Terri Moore, and Republic Title through its attorney Peter Graf.

>    **Response:**  Claimant Price admits that a notice of the administrative
>    forfeiture was sent to Price and William M. Ravkind; however, is without
>    sufficient knowledge to either admit or deny the remainder of the allegations
>    contained in Paragraph 25 above and, therefore, denies same.

26.   To date Price has not filed a claim to the $180,763.47. His deadline to file a claim is June 1, 2012.

**Response:** Claimant Price denies the allegations contained in Paragraph 26 above.

## Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h)

27.   As shown below, Price and others have conspired for Price to accumulate assets far beyond his disclosed means to save and/or pay for same since at least in or about 1995, the total value and nature of which cannot be accounted for but for the undisclosed and illegal income detailed below.

**Response:** Claimant Price denies the allegations contained in Paragraph 27 above.

28.   Through numerous transactions at several financial institutions, Price and others have purposefully converted a high percentage of undisclosed income streams into cash or cash equivalents at or about the time of receipt. Many times this cash conversion has been structured to avoid a currency transaction report (CTR), and it has not appeared as a deposited balance in any known account.

**Response:** Claimant Price denies the allegations contained in Paragraph 28 above.

29.   Price and others have also at times commingled undisclosed and illegal income with legitimate income in order to make it more difficult to trace their activities. Thus, like most money launderers, Price and his conspirators have

commingled legal income with illegal income in order to mask, hide, and aid the money laundering conspiracy. All of Price's "legitimate" income and/or use of legitimate bank accounts is therefore substantially connected to and involved in the money laundering conspiracy.

> **Response:** Claimant Price denies the allegations contained in Paragraph 29 above.

## Bankruptcy

**30.** On April 12, 1996, John Wiley Price filed a Chapter 7 bankruptcy petition number 396-32420 under the name "John Wiley Price III."

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 30 above and, therefore, denies same.

**31.** Price's declaration of assets totaled $339,080.79.

a. The $339,080.79 included the $289,336.26 in exempted property listed below.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 31 (and any sub-paragraphs) above and, therefore, denies same.

**32.** The bankruptcy proceedings lasted until May 11, 2001.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 32 above and, therefore, denies same.

**33.** The bankruptcy proceedings resulted in a discharge of approximately $372,022.53 to the benefit of John Wiley Price.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 33 above and, therefore, denies same.

34.    The bankruptcy proceedings permitted Price to retain the following exempted property valued in total at $289,336.26:

a.    Homestead located at 406 E Fifth Street, Dallas, Texas valued at $100,000.00.

b.    Furnishings and collections of watches, cufflinks, and African art valued at $23,400.00.

c.    Clothing valued at $700.00.

d.    Other jewelry valued at $420.00.

e.    A shotgun and pistol valued at $150.00.

f.    Golf clubs valued at $100.00.

g.    Life insurance policy valued at $13,000.00.

h.    Retirement plan valued at $130,536.26

i.    1948 Pontiac valued at $15,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 34 (and its sub-paragraphs) above and, therefore, denies same. The events described in Paragraph 34 and sub-paragraphs a. thru i. occurred approximately sixteen years ago. The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

35.    The bankruptcy proceedings did not exempt:

a.    $1,400.00 in cash declared on hand and in banks,

b.    an investment in stock,

c.      several accounts receivable,

d.      three additional automobiles or parts thereof.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 35 (and its sub-paragraphs) above and, therefore, denies same. The events described in Paragraph 35 and sub-paragraphs a. thru d. occurred approximately sixteen years ago. The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

## Conspiracy to Commit Bankruptcy Fraud

36.      Affiant believes the following facts will show that John Wiley Price and Dapheny Fain conspired to hide certain assets of Price through the use of a bank account concealed in the name of another person and through a contract with a third party wherein Fain was the nominee partner for Price. Together they obtained the assistance of third parties to cause real estate title and loan records to omit disclosure of the interests held by Fain for the benefit of Price. In so doing, they were able to conceal the existence of these assets from creditors and the bankruptcy court until such time as the bankruptcy was terminated five years later. The facts will show that Price and Fain then began to open new bank accounts under Price's true name with previously concealed monies, and to transfer title of the real properties and/or proceeds of the sale of real properties held by Fain to Price.

> **Response:** Claimant Price denies the allegations contained in Paragraph 36 above.

37.      On or about August 4, 1995, Price signed a signature card to open checking account ending in 6372 at Farmer's National Bank in Forney, Texas.

**Response:** Claimant Price admits that at one point in time he opened a checking account at Farmer's National Bank in Forney, Texas; however, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 37 above and, therefore, denies same.

38.    Price opened the checking account ending in 6372 at Farmer's National Bank in Forney, Texas under the name of **[REDACTED]**.

**Response:** Claimant Price admits that at one point in time he opened a checking account at Farmer's National Bank in Forney, Texas; however, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 38 above and, therefore, denies same.

39.    Price was the sole signer on the account ending in 6372.

**Response:** Claimant Price admits that at one point in time he opened a checking account at Farmer's National Bank in Forney, Texas; however, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 39 above and, therefore, denies same.

40.    The signature card for the account ending in 6372 does not contain a tax identification number.

**Response:** Claimant Price admits that at one point in time he opened a checking account at Farmer's National Bank in Forney, Texas; however, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 40 above and, therefore, denies same.

41.    When Price opened the account ending in 6372, **[REDACTED]** still had a checking account in her name which had been open since 1985.

**Response:** Claimant Price admits that at one point in time he opened a checking account at Farmer's National Bank in Forney, Texas; however, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 41 above and, therefore, denies same.

**42.**   On or about April 12, 1996, when John Wiley Price filed his Chapter 7 bankruptcy petition (case number 396-32420), he signed and filed it under oath in the name "John Wiley Price III."

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 42 above and, therefore, denies same. The events described in Paragraph 42 occurred approximately sixteen years ago. The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

**43.**   On or about April 29, 1996, John Wiley Price personally signed and filed several official bankruptcy documents under oath with the name "John Wiley Price III."

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 43 above and, therefore, denies same. The events described in Paragraph 43 occurred approximately sixteen years ago. The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

**44.**   During the course of the investigation affiant has confirmed that John Wiley Price III is not Price's true name, and these documents represent the only known use of this name by Price.

>   **Response:**  Claimant Price denies the allegations contained in Paragraph 44 above.

**45.**   At least one of those bankruptcy documents required Price to disclose all of his assets at that time, and any transfers of assets that had occurred during the preceding 12 months.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 45 above and, therefore, denies same. The events described in Paragraph 45 occurred approximately sixteen years ago. The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

46. Price did not disclose to the bankruptcy court that he had sole control of an account opened in the name of his mother 8 months prior to his filing.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 46 above and, therefore, denies same. The events described in Paragraph 46 occurred approximately sixteen years ago. The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

47. Price did not disclose to the bankruptcy court the existence of a safe deposit box under his control at Farmer's National Bank in Forney.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 47 above and, therefore, denies same. The events described in Paragraph 47 occurred approximately sixteen years ago. The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

48. On or about June 28, 1996, Dapheny Fain opened a checking account ending in 3231 at Farmer's National Bank in Forney, Texas.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 48 above and, therefore, denies same.

49. On or about November 29, 1996, Fain opened an account at Common Ground Community Credit Union.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 49 above and, therefore, denies same.

50.    Fain opened the Common Community Credit Union account on November 29, 1996, with an application showing:

a.    Price as her employer and

b.    naming Price as the account beneficiary payable upon death.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 50 (and its sub-paragraphs) above and, therefore, denies same.

51.    On or about January 9, 1997, Price caused his campaign fund to provide a payment of $13,661.47 to Palmer & Palmer.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 51 above and, therefore, denies same.

52.    Price had his campaign fund report the $13,661.47 payment to Palmer & Palmer as a payment of a settlement to the bankruptcy court.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 52 above and, therefore, denies same.

53.    Fain was the campaign treasurer of Price's campaign fund at the time the $13,661.47 payment to Palmer & Palmer was made and reported.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 53 above and, therefore, denies same.

54.   On or about March 6, 1998, Kathy L. Nealy filed an assumed name record with Dallas County doing business as Kathy L. Nealy & Associates (KLNA).

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 54 above and, therefore, denies same.

55.   At the time she formed KLNA, Kathy L. Nealy had been the campaign manager for Price since at least in or about 1985.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 55 above and, therefore, denies same.

56.   Between on or about October 30, 1998 and March 9, 1999, title and loan records show that Wayne White borrowed money at Lakeside National Bank in Rockwall, Texas.

a.   Wayne White used this money to purchase three properties from D.L. Faulkner.

b.   The three purchased properties had been under a lien held by the FDIC pursuant to a criminal forfeiture judgment.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 56 (and its subparagraphs) above and, therefore, denies same.

57.   The three properties purchased with the money borrowed from Lakeside National Bank in Rockwall, Texas between on or about October 30, 1998 and March 9, 1999 were:

a.   The property identified on Grady Niblo Road is a parcel of approximately 9 acres more specifically known to have the address of 7001 Grady Niblo Road.

b.   The property identified at 635 and I-30 is a tract known to have the address of 16800 LBJ Freeway in Dallas.

c.   The property identified as a "certain identified Trinity property" is a tract known to have the address of 7424 Fairport Road in Dallas.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 57 (and its sub-paragraphs) above and, therefore, denies same.

58.   Lakeside National Bank records reflect that Price was considered to be a co-borrower with Wayne White for the money White borrowed at Lakeside National Bank in Rockwall, Texas to purchase the three properties.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 58 above and, therefore, denies same.

59.   Price's name was omitted from the title and loan records required to purchase the three properties.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 59 above and, therefore, denies same.

60.    The loan officer at Lakeside National Bank was unaware that anyone other than White had an interest in the titles to the properties that were used as collateral for the loans.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 60 above and, therefore, denies same.

61.    Despite the omission of Price's name from the title and loan records, Price made payments against the Lakeside National Bank note(s) in White's name.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 61 above and, therefore, denies same.

62.    On or about April 4, 1999, Fain signed a contractual agreement with Wayne White.

a.    Fain and White signed the contract together doing business as John Wayne Properties.

b.    The contract was signed to express "an equally divided (50%) arrangement between the parties" for the purchase and ownership of the three properties listed above which White had purchased with money borrowed at Lakeside National Bank in Rockwall, Texas.

c.    Notes to the agreement called for a 20% down payment.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 62 (and its sub-paragraphs) above and, therefore, denies same.

**63.** The April 4, 1999 agreement between Dapheny Fain and Wayne White was witnessed by Caryn Fain.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 63 above and, therefore, denies same.

**64.** The April 4, 1999 agreement between Dapheny Fain and Wayne White was witnessed by Debra White.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 64 above and, therefore, denies same.

**65.** The contractual agreement between Fain and White was not filed as a public record.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 65 above and, therefore, denies same.

**66.** After the April 4, 1999 agreement between Fain and White, the title to the properties was recorded only in the name of White.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 66 above and, therefore, denies same.

**67.** On or about January 20, 2000, Price obtained a loan of $15,500.00 at Farmer's National Bank in Forney.

> **Response:** Because of the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 67 above and, therefore, denies same.

**68.**   The $15,500.00 from Price's loan at Farmer's National Bank in Forney was used for the purchase of a 1997 Jaguar XK priced at $39,500.00.

> **Response:** Because of the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 68 above and, therefore, denies same.

**69.**   Fain traded a 1996 Jaguar XK valued at $25,000.00 for the remaining balance owed on the 1997 Jaguar XK for which Price obtained the loan at Farmer's National Bank in Forney on or about January 20, 2000.

> **Response:** Because of the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 69 above and, therefore, denies same. Price admits that over a period of time he has negotiated sales and purchases of automobile on behalf of Ms. Fain.

**70.**   The 1997 Jaguar XK for which Price obtained the loan at Farmer's National Bank in Forney on or about January 20, 2000 was titled in the name of Dapheny Fain.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 70 above and, therefore, denies same.

**71.**   On or about July 28, 2000, a Form 1 Individual Estate Property Record and Report was generated for John Wiley Price III in his Chapter 7 proceeding.

a.   This form reflected the same assets as had been reported on or about May 17, 1996 which included only $1,400.00 in cash deposits in bank accounts.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 71 (and its sub-paragraph) above and, therefore, denies same. The events described in

Paragraph 71 occurred approximately sixteen years ago.  The attorney who handled the bankruptcy (Philip Palmer) is deceased and Price does not have access to those records.

72.   On or about September 22, 2000, Price obtained a mortgage loan of $112,000.00 on his residence at 406 E. Fifth Avenue.

>   **Response**:  Claimant Price admits he obtained a mortgage on his residence; however, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 72 above and, therefore, denies same.

73.   On or about September 25, 2000, Price signed a signature card at Farmer's National Bank in Forney to open a checking account ending in 8671.

a.   On or about September 25, 2000, Fain also signed a signature card at Farmer's National Bank in Forney to open a checking account ending in 8671.

b.   This account was opened for Kwanzaa Fest, Incorporated.

c.   Kwanzaa Fest, Inc. is supposed to be a 501c3 non-profit entity.

d.   The account was opened with an initial deposit of $22,954.15.

>   **Response:**  Claimant Price admits the first sentence in Paragraph 73, however, because of the passage of time, does not recall the date.

>   **a. and b.  Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 73 (a and b) above and, therefore, denies same.

>   **c. Response:**   Admits that Kwanzaa Fest, Inc. is a 501c3 non-profit entity.

>   **d. Response:**   Claimant is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 73(d) above and, therefore, denies same.

74.   On or about September 25, 2000, Price obtained title in the residence at 1604 Sylvan Avenue with Ora Lee Watson.

**Response:**  Claimant Price admits that he obtained title with Ora Lee Watson to a lot at 1604 Sylvan Avenue but denies that it was a residence. Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 74 above and, therefore, denies same.

75.   On or about December 29, 2000, the Dallas County website records reflect that Price paid the property taxes on 7001 Grady Niblo Road for the year 1999.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 75 above and, therefore, denies same.

76.   On or about December 29, 2000, the Dallas County website records reflect that Price paid the property taxes on 7001 Grady Niblo Road for the year 2000.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

77.   On or about March 2, 2001, Price traded a 1995 Dodge Viper valued at $41,000.00 to purchase a 1998 Dodge Viper priced at $47,000.00.

**Response:**  Claimant Price admits there was a transaction involving the two Vipers but as to the remaining allegations in Paragraph 77 is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

78.   Price financed the balance of the March 2, 2001 Dodge Viper trade with a loan at City Bank Forney (formerly Farmer's National).

**Response:**  Claimant Price admits there was a loan at the bank involving the automobiles but is without sufficient knowledge to either admit or deny the specific allegations asserted and, therefore, denies same.

79.    On or about May 11, 2001, the Chapter 7 bankruptcy proceeding of Price was

terminated.

>    **Response:**  Claimant Price is without sufficient knowledge to either admit
>    or deny the specific allegations asserted in Paragraph 79 above and,
>    therefore, denies same. The events described in Paragraph 79 occurred
>    approximately sixteen years ago.  The attorney who handled the bankruptcy
>    (Philip Palmer) is deceased and Price does not have access to those records.

80.    Price discharged approximately $372,000.00 of debt through the bankruptcy

proceedings.

>    **Response:**  Claimant Price is without sufficient knowledge to either admit
>    or deny the specific allegations asserted in Paragraph 80 above and,
>    therefore, denies same. The events described in Paragraph 80 occurred
>    approximately sixteen years ago.  The attorney who handled the bankruptcy
>    (Philip Palmer) is deceased and Price does not have access to those records.

81.    On or about May 23, 2001, Price opened Dallas Telco checking accounting
ending in 1862.      .

a.            This account was opened with a deposit of $64,825.59.

>    **Response:**  Due to the passage of time, Claimant Price is without sufficient
>    knowledge to either admit or deny the specific allegations asserted in
>    Paragraph 81 and 81.a above and, therefore, denies same.

82.    Fain was authorized on the Dallas Telco checking account ending in 1862 to:

b.            cash checks or

c.            to deposit checks with cash back.

>    **Response:**  Claimant Price admits that Fain has been authorized to use
>    certain accounts but, because of the passage of time in without sufficient
>    knowledge to either admit or deny the specific allegations asserted in
>    Paragraph 82 a. and b. above and, therefore, denies same.

83.    In October of 2001 Price caused Fain to go to Dallas Telco.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 83 above and, therefore, denies same.

84.    In October of 2001 Fain conducted a transaction with the Dallas Telco checking account ending in 1862.

a.       The transaction was conducted with a check from KLNA payable to Price in the amount of $1,500.00 with the notation "Loan" on the memo line.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 84 and 84a above and, therefore, denies same.

85.    On or about June 8, 2001, Fain opened Dallas Telco checking account ending in 3476.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 85 above and, therefore, denies same.

86.    When Fain opened the Dallas Telco checking account ending in 3476:

a.       she named Price as her employer and

b.       she named Caryn Fain as her beneficiary.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 86 and 86a and 86b above and, therefore, denies same.

87.    On or about July 26, 2001, Price had 5 Certificates of Deposit held by City Bank of Forney.

**Response:** Claimant Price admits he has had Certificates of Deposits at more than one bank but as to other specifics is without sufficient knowledge to either admit or deny the allegations asserted in Paragraph 87 above and, therefore, denies same.

88. On or about July 26, 2001, Price used the 5 Certificates of Deposit held by City Bank of Forney date as collateral for a line of credit to obtain a USAA credit card with a $10,000.00 limit.

**Response:** Due to the passage of time Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 88 above and, therefore, denies same.

89. On or about September 3, 2002, Price purchased from Wayne White the interest in approximately 9 acres known as 7001 Grady Niblo held in the name of Wayne White.

**Response:** Claimant Price does not recall the date but admits he purchased the property in Paragraph 89 above from Wayne White.

90. Price obtained a loan of $150,000.00 from City Bank in Forney (formerly Farmer's National) for his September 3, 2002 purchase of the interest in 7001 Grady Niblo.

**Response:** Claimant Price admits he obtained a loan of $150,000.00 as stated in Paragraph 90 above but, as to the date, he does not remember .

91. Wayne White was the only seller listed on the Department of Housing and Urban Development Settlement Statement or "HUD-1" for Price's September 3, 2002 purchase of the interest in 7001 Grady Niblo.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 91 above and, therefore, denies same.

92.   However, the HUD-1 Settlement Statement for Price's September 3, 2002 purchase of 7001 Grady Niblo reflected a partnership adjustment (increase) of $25,303.71 to the purchase price of $125,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 92 above and, therefore, denies same.

93.   Price was present at Ranger Title during the closing of the September 3, 2002 purchase of the property interest in 7001 Grady Niblo from White.

**Response:** Claimant Price admits he was at the closing of the purchase of the property as stated in Paragraph 93 above except for the date.

94.   Fain was present at Ranger Title during the closing of the September 3, 2002 purchase of the property interest in 7001 Grady Niblo from White.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 94 above and, therefore, denies same.

95.   Price requested a title insurance policy in his name for his September 3, 2002 purchase of 7001 Grady Niblo.

**Response:** Claimant Price admits Paragraph 95 above except for the date.

96.   Ranger Title was requested to make the partnership adjustment on the HUD-1 with no knowledge of the underlying partnership agreement when Price purchased 7001 Grady Niblo on or about September 3, 2002.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 96 above and, therefore, denies same.

97. Based on the foregoing facts, Affiant believes the partnership adjustment for Price's September 3, 2002 purchase of 7001 Grady Niblo from White was necessary to compensate White for the 50% of debt and fees that otherwise would have been charged to the proceeds of Fain.

**Response:** Claimant Price is unable to guess what the Affiant believes, and therefore denies the above paragraph..

98. The HUD-1 reflected net proceeds to White of $96,505.38 after payoff of the mortgage note at Lakeside National Bank in the amount of $42,643.89.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 98 above and, therefore, denies same.

99. At the closing Ranger Title was informed of a prior partnership agreement for the property, and Ranger Title prepared a Quit Claim Deed for Fain in order to ensure that the new title would be securely recorded in the name of Price.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 99 above and, therefore, denies same.

100. On or about September 3, 2002, Fain executed the Quit Claim Deed to Price for her previously undisclosed interest in 7001 Grady Niblo.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 100 above and, therefore, denies same.

101.   On or about January 3, 2003, Price made a down payment of $35,000.00 to assist Fain in the purchase of the residence at 625 Missionary Ridge in DeSoto, Texas.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 101 above and, therefore, denies same.

102.   The purchase price of 625 Missionary Ridge in DeSoto, Texas was $168,626.74.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 102 above and, therefore, denies same.

103.   Fain obtained a mortgage loan for 625 Missionary Ridge in DeSoto, Texas to finance what remained of the $168,626.74 purchase price.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 103 above and, therefore, denies same.

104.   On or about May 15, 2003, Price obtained a $52,000.00 loan at Dallas Telco using his 1998 Dodge Viper as collateral.

> **Response:**  Claimant Price admits as to financing but, due to the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 104 above and, therefore, denies same.

105.   Price used part of the May 15, 2003 loan of $52,000.00 from Dallas Telco to pay off his loan ending in 1427 for the 1998 Viper at City Bank (formerly Farmer's National) in the amount of $16,369.69.

**Response:** Claimant Price admits as to financing but, due to the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 105 above and, therefore, denies same.

106. Price used part of the May 15, 2003 loan of $52,000.00 from Dallas Telco to pay off his loan ending in 1025 for the 1997 Jaguar at City Bank (formerly Farmer's National) in the amount of $12,681.65.

**Response:** Claimant Price admits as to financing but, due to the passage of time, is without sufficient knowledge to admit to the specifics of amounts and date asserted in Paragraph 106 above and, therefore, denies same.

107. Price deposited the remaining balance of $22,904.21 from his May 15, 2003 loan of $52,000 from Dallas Telco into his Dallas Telco checking account ending in 1862.

**Response:** Claimant Price admits as to financing but, due to the passage of time, is without sufficient knowledge to admit to the specific amounts and date asserted in Paragraph 107 above and, therefore, denies same.

108. On or about May 27, 2003, Price opened Lakeside National Bank checking account ending in 1984.

**Response:** Claimant Price admits the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 108 above and, therefore, denies same.

109. Price opened the Lakeside National Bank checking account ending in 1984 with the deposit of a City Bank (formerly Farmer's National) cashier's check in the amount of $33,901.65.

**Response:** Claimant Price admits the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny

the specific allegations asserted in Paragraph 109 above and, therefore, denies same.

110. The $33,901.65 City Bank cashier's check that Price used to open the Lakeside National Bank checking account ending in 1984 was derived from the sale of Certificates of Deposit.

> **Response:** Claimant Price admits that the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 110 above and, therefore, denies same.

111. On or about May 27, 2003, Price opened Lakeside National Bank savings account ending in 2985.

> **Response:** Claimant Price admits that the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 111 above and, therefore, denies same.

112. Price opened the Lakeside National Bank savings account ending in 2985 with a deposit of $6,363.27.

> **Response:** Claimant Price admits that the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 112 above and, therefore, denies same.

113. The $6,363.27 used to open the Lakeside National Bank savings account ending in 2985 was derived from closing out City Bank (formerly Farmer's National) savings account ending in 7407.

> **Response:** Claimant Price admits that the transaction occurred but, because of the passage of time, s without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 113 above and, therefore, denies same.

114.   On or about June 2, 2003, Price opened the Lakeside National Bank money market account ending in 2034.

>    **Response:**  Claimant Price admits the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 114 above and, therefore, denies same.

115.   Price opened the Lakeside National Bank money market account ending in 2034 with a cashier's check from City Bank (formerly Farmer's National) in the amount of $19,987.33.

>    **Response:**  Claimant Price admits the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 115 above and, therefore, denies same.

116.   The $19,987.33 City Bank cashier's check used to open the Lakeside National Bank money market account ending in 2034 was derived from Price's sale of Certificates of Deposit.

>    **Response:**  Claimant Price admits the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 116 above and, therefore, denies same.

117.   On or about June 2, 2003, Price opened the Lakeside National Bank money market account ending in 2042.

>    **Response:**  Claimant Price admits the transaction occurred but, because of the passage of time, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 117 above and, therefore, denies same.

118.   Price opened the Lakeside National Bank money market account ending in

2042 with a cashier's check from City Bank (formerly Farmer's National) in the

amount of $26,584.83.

> **Response:**  Claimant Price admits the transaction occurred but, because of
> the passage of time, is without sufficient knowledge to either admit or deny
> the specific allegations asserted in Paragraph 118 above and, therefore,
> denies same.

119.   The $26,584.83 City Bank cashier's check used to open the Lakeside National

Bank money market account ending in 2042 was derived from Price's sale of

Certificates of Deposit.

> **Response:**  Claimant Price admits the transaction occurred but, because of
> the passage of time, is without sufficient knowledge to either admit or deny
> the specific allegations asserted in Paragraph 119 above and, therefore,
> denies same.

120.   On or about July 18, 2003, Price obtained a loan of $150,000.00 from

Lakeside National Bank.

> **Response:**  Claimant Price admits the transaction occurred but, because of
> the passage of time, is without sufficient knowledge to either admit or deny
> the specific allegations asserted in Paragraph 120 above and, therefore,
> denies same.

121.   Price used the $150,000.00 from Lakeside National Bank to pay off the loan

originated in 2002 at City Bank for the purchase of the interest in property known

as 7001 Grady Niblo Road.

> **Response:**  Claimant Price admits the transaction occurred but, because of
> the passage of time, is without sufficient knowledge to either admit or deny
> the specific allegations asserted in Paragraph 121 above and, therefore,
> denies same.

122.   When he obtained the $150,000.00 from Lakeside National Bank on or about July 18, 2003, Price valued the property known as 7001 Grady Niblo Road at $330,000.00.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

123.   To obtain the $150,000.00 loan from Lakeside National Bank, Price filed personal financial statements with Lakeside National Bank on or about July 18, 2003, reflecting that as of March 31, 2003 Price had:

a.     assets of $875,500.00,

b.     a net worth of $672,500.00,

c.     cash in banks in the amount of $103,500.00,

d.     a 50% ownership interest in the property previously identified at 635 and I-30 with a known address of 16800 LBJ Freeway in Dallas, and

e.     a 50% ownership interest in the property previously identified as a "certain identified Trinity property" that is known to have the address of 7424 Fairport Road in Dallas.

> **Response:** Claimant Price admits he obtained a loan for $150,000.00 but does not remember the dates. Due to the passage of time, he is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 123 a. through e. above and, therefore, denies same.

124.   The properties at 16800 LBJ Freeway in Dallas and 7424 Fairport Road in Dallas were still in the name of White when Price filed his personal financial statements with Lakeside National bank for the $150,000.00 loan.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in paragraph 124 above and, therefore, denies same.

125. The submission of the financial statement of March 31, 2003 reflecting the ownership by Price of two properties still in the name of White (in contract with Fain) further confirms that Fain's interest in properties with White was only a nominee interest for Price.

**Response:** Claimant Price denies the specific allegations asserted in Paragraph 125 above.

126. On or about February 18, 2005, White sold the 7424 Fairport Road property to a third party buyer for $45,000.00 with the balance of the debt at $8,462.21.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 126 above and, therefore, denies same.

127. Fain was not named on the HUD-1 Settlement Statement for the February 18, 2005 sale of the 7424 Fairport Road property.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 127 above and, therefore, denies same.

128. However, Fain executed a Quit Claim Deed to the Buyer for the February 18, 2005 sale of the 7424 Fairport Road property which was not recorded.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 128 above and, therefore, denies same.

129.  Proceeds of the February 18, 2005 sale of the 7424 Fairport Road property were divided 50% each to the Whites and Fain on a separate document which Fain signed.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 129 above and, therefore, denies same.

130.  Fain received a net payment of $17,495.92 from Title Texas for the February 18, 2005 sale of the 7424 Fairport Road property.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 130 above and, therefore, denies same.

131.  On or about February 22, 2005, Price deposited a Title Texas check payable to Fain in the amount of $17,495.92 into his Lakewood National Bank savings account ending in 2985.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 131 above and, therefore, denies same.

132.  On or about September 14, 2006, Price sold his 1998 Dodge Viper to Danny Faulkner.

> **Response:**  Claimant Price admits he sold his 1998 Dodge Viper to Danny Faulkner but is not sure of the date.

133.  Danny Faulkner is the son of D.L. Faulkner.

> **Response:**  Claimant Price admits that Danny Faulkner is the son of D.L. Faulkner.

134.   The declared price for the sale of the 1998 Dodge Viper between Price and Danny Faulkner was $30,000.00.

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 134 above and, therefore, denies same.

135.   However, the cashier's check Price received from Faulkner was actually $38,000.00.

>   **Response:**  Claimant Price admits Paragraph 135 above

136.   Price deposited the $38,000.00 cashier's check from Danny Faulkner into the Lakeside National Bank account ending in 2985.

>   **Response:**  Claimant Price admits Paragraph 136 above.

137.   In or about December 2011 Price negotiated the sale of 7001 Grady Niblo to W.O. Henry at the purchase price of $750,000.00, pending HUD approval of the land cost for the proposed project.

>   **Response:**  Claimant Price admits Paragraph 137 above.

138.   Henry had previously advanced a payment of $50,000.00 to Price plus certain expenses for the 7001 Grady Niblo property.

>   **Response:**  Claimant Price admits Paragraph 138 above.

139.   On December 15, 2011, Henry paid off all notes and fees necessary to transfer the 7001 Grady Niblo property to his control in a closing at Republic Title.

**Response:** Claimant Price admits that various notes were paid off but is without sufficient knowledge to either admit or deny that all notes and fees were paid off as asserted in Paragraph 139 above and, therefore, denies same.

140. The negotiated contract between Price and Henry for the 7001 Grady Niblo property called for an immediate payment of $50,000.00 and other monies to be paid to Price upon certain milestones in the development.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

141. On December 19, 2011, FBI agents seized the $50,000.00 payment from Henry to Price pursuant to a Federal Seizure Warrant.

**Response:** Claimant Price admits Paragraph 141 above.

142. In or about January 2012 HUD approved the 7001 Grady Niblo land cost for Henry at $750,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 142 above and, therefore, denies same.

143. After HUD approved the 7001 Grady Niblo land cost at $750,000.00, Henry was able to calculate the final amount due to Price after netting out other expenses and advances as agreed. The final balance due to Price, to be paid in installments of $25,000.00 per month, was $180,763.47.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 143 above and, therefore, denies same.

144. In or about February 2012 Henry and Price reduced to writing their agreement that Henry owed a final balance to Price of $180,763.47 which was to be paid to Price in installments of $25,000.00 per month.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

145. In or about March 2012 Republic Title learned of the other monies that were negotiated outside of the closing in December when a media outlet reported the FBI seizure of the $50,000.00 while showing an image of a notification letter which the FBI had sent only to Price and his attorney William Ravkind.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 145 above and, therefore, denies same.

146. When Republic Title learned of the monies that Price and Henry had negotiated outside of their closing on the 7001 Grady Niblo property, the title company advised Henry that the unpaid purchase monies in effect gave Price a vendor's lien on the property and that Republic Title would be unable to issue title insurance for HUD.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 146 above and, therefore, denies same.

147. Republic Title ordered Henry to do a revised closing on the 7001 Grady Niblo property with a requirement for all purchase monies to be wired to Republic Title prior to the closing.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 147. above and, therefore, denies same.

148. As part of the revised closing on the 7001 Grady Niblo property, Price was required to execute a release of lien to Republic Title.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

149. On March 18, 2012, the FBI obtained a seizure warrant for all proceeds due to John Wiley Price from the sale of the 7001 Grady Niblo property.

a.      The prior $50,000.00 remained seized and FBI agents served the seizure warrant on Republic Title on March 18, 2012.

b.      Additional funds of $180,763.47 were seized on March 23, 2012.

**Response:** Claimant Price admits Paragraph 149 a. and b. above.

150. Affiant believes the above facts support a reason to believe that Price, Fain, and others knowingly and fraudulently conspired to conceal property that should have been included in Price's bankruptcy estate, and that in a series of financial transactions they intended to convert and launder the proceeds of that unlawful activity into titled property interests and/or the funds which have been seized from the sales of those interests.

**Response:** Claimant Price denies the allegations in Paragraph 150.

## Conspiracy to violate 18 U.S.C. § 666

151.   Dallas County is a local government entity that is a political subdivision of the State of Texas as defined by the statute.

**Response:**   Claimant Price admits Paragraph 151 above.

152.   Price has been an elected member of the Dallas County Commissioners Court, the governing body of Dallas County, since in or about January 1985.

**Response:**   Claimant Price admits Paragraph 152 above.

153.   Price is thus an agent of the local government as defined by the statute.

**Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

154.   Dallas County has received at least $10,000.00 in federal funds under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of federal assistance for each of the years 2001 through 2011.

**Response:**   Claimant Price admits Paragraph 154 above.

155.   Since filing her assumed name record for KLNA on or about March 6, 1998, Nealy has acted through KLNA as a consultant and lobbyist for clients with matters that came under the jurisdiction of local and state governments including Dallas County and the City of Dallas.   Those matters included legislative and contractual issues.

**Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 155 above and, therefore, denies same.

156.  From in or about 2001 through 2011 KLNA received payments in excess of $2,000,000.00 from clients with legislative or contractual matters under the jurisdiction or influence of the Dallas County Commissioners including:

a.          American Airlines,

b.          Atos Origin,

c.          Bearing Point,

d.          Hillwood,

e.          Provident Realty,

f.     Q-Net,

g.     Schlumberger,

h.     Unisys,

i.     CMGRP / Weber-Shandwick (for Wal-Mart and others),

j.     and others.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 156 a. through j.above and, therefore, denies same.

157.  From in or about 2001 through 2011, KLNA received over $500,000.00 in additional payments from other consultants and campaign accounts for various political campaigns.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 157 above and, therefore, denies same.

158.  Since in or about 2002 through 2011, Nealy has owned three different Chevrolet Avalanche trucks in succession.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 158 above and, therefore, denies same.

159.   For the majority of the time in the following years, Price has had the use of a

Chevrolet Avalanche truck owned by Nealy:

a.      2002

b.      2003

c.      2004

d.      2005

e.      2006

f.      2007

g.      2008

h.      2009

i.      2010

j.      2011

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 159 a. through j. above and, therefore, denies same.

160.   The value of Price's use of Nealy's Chevrolet Avalanche truck for the majority

of the time within each year from 2002 through 2011 is $5,000.00 or more each

year.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 160 above and, therefore, denies same.

161.   Since in or about 2004 through 2011, Nealy has owned a 2005 BMW 645 convertible automobile.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 161 above and, therefore, denies same.

162.   For the majority of the time for the following years, Price has had the use of the 2005 BMW 645 convertible automobile owned by Nealy:

a.        2004

b.        2005

c.        2006

d.        2007

e.        2008

f.        2009

g.        2010

h.        2011

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 162 a. through h. above and, therefore, denies same.

163.   The value of Price's use of Nealy's 2005 BMW 645 convertible automobile for the majority of the time within each year from 2004 through 2011 is $5,000.00 or more each year.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 163 above and, therefore, denies same.

164. Since at least in or about 2001 through 2011, Nealy has provided the payment of monies to Price in various forms totaling in excess of $500,000.00.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 164 above and, therefore, denies same.

165. Of the payments from Nealy to Price, some purport to be funding or reimbursement of expenses paid by Price in connection with the renovation or repair of real properties held in the name of Nealy.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 165 above and, therefore, denies same.

166. However, Price has received the majority of the income from the real properties for which Nealy purports to reimburse Price for renovation or repair expenses.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 166 above and, therefore, denies same.

167. Of the payments from Nealy to Price, almost half of the payments were made to Price by in or about 2005.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 167 above and, therefore, denies same.

168. Of the payments from Nealy to Price, over $60,000.00 was from payments to or from third parties that were diverted to Price.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 168 above and, therefore, denies same.

169. Of the payments from Nealy to Price, over $80,000.00 was from payments Nealy made as checks payable to Dallas Telco.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 169 above and, therefore, denies same.

170. Of the payments from Nealy to Price, $13,000.00 was from payments Nealy made as checks payable to Kathy Nealy and gave to Price.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 170 above and, therefore, denies same.

171. Of the payments from Nealy to Price, over $55,000.00 was from payments made to Price by the tenant of a building titled in the name of Nealy.

a.        Most of these payments were converted to cash between, in, or about April 2007 and May 2011.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 171 and 171a. above and, therefore, denies same.

172. Kwanzaa Fest, Inc. is organized as a 501c3 non-profit entity.

**Response:** Claimant Price admits Kwanzaa Fest, Inc. is organized as a 501c3 non-profit entity.

173. Price and Fain control Kwanzaa Fest as an entity.

**Response:** Claimant Price denies Paragraph 173 above.

174.   Since at least in or about 2003 Nealy has acted as the Festival Consultant to Kwanzaa Fest.

   **Response:**  Claimant Price admits Paragraph 174 above.

175.   The Kwanzaa Fest sponsor report for December 2003 reflects KLNA clients American Airlines, Schlumberger, Wal-Mart, Hillwood, and Provident Realty among others who contributed to the event.

   **Response:**  Claimant Price admits Paragraph 175 above.

## Relevant Selected Transactions Between Nealy and Price

176.   On or about January 2, 2002, Price withdrew $9,600.00 from a bank account of KLNA at City Bank in Forney and:

a.        deposited $3,000.00 to Price's savings account at City Bank in Forney,

b.        obtained 2 cashier's checks of $2,500.00 each for Price's benefit, and

c.        obtained $1,600.00 in cash.

   **Response:**  Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted Paragraph 176 and 176a through c above and, therefore, denies same.

177.   On or about January 15, 2002, Price deposited a Hillwood entity check payable to KLNA in the amount of $23,169.55 to a bank account of KLNA at City Bank in Forney.

a.        As part of this transaction, Price withdrew $2,500.00 in cash and

b.        Price then deposited that $2,500.00 into his account at City Bank in Forney ending in 6372.

**Response:** Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 177 and 177a and b above and, therefore, denies same.

178. On or about February 5, 2002, on a motion by Price, the Dallas County Commissioners Court (DCCC) adopted court order 2002-264 which rejected the recommendation of the Evaluation Committee and selected 4 companies including Schlumberger to proceed as finalists in the next phase of the Request for Proposal (RFP).

**Response:** The allegation in Paragraph 178 is misleading because all of the court orders are motioned and seconded by the same individual and voted on in unison. Accordingly, the procedure that the allegation assumes did not exist and, therefore, Claimant Price denies same.

179. On or about February 5, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $7,500.00 into her City Bank account ending in 8994.

a.      As part of this bank visit, Nealy withdrew $2,500.00 cash from the same account.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 179 and 179a above and, therefore, denies same.

180. On or about April 26, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $12,500.00 into her Bank of America account ending in 1364.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 180 above and, therefore, denies same.

181.   On or about April 30, 2002, on a motion by Price, the DCCC adopted court order 2002-800 which authorized Dallas County staff and consultants to proceed with Schlumberger to develop an agreement for contract.

**Response:** The allegation in Paragraph 181 is misleading because all of the court orders are motioned and seconded by the same individual and voted on in unison. Accordingly, the procedure that the allegation assumes did not exist and, therefore, Claimant Price denies same.

182.   On or about May 20, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $13,073.61 into her Bank of America account ending in 1364.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 182 above and, therefore, denies same.

183.   On or about May 21, 2002, on a motion by Price, the DCCC adopted court order 2002-947 which authorized the selection of Schlumberger as the new information technology ("IT") service provider for Dallas County.

**Response:** The allegation in Paragraph 183 is misleading because all of the court orders are motioned and seconded by the same individual and voted on in unison. Accordingly, the procedure that the allegation assumes did not exist and, therefore, Claimant Price denies same.

184.   On or about May 21, 2002, Nealy withdrew $5,500.00 from her KLNA account at City Bank in Forney.

a.          As part of this transaction, Nealy deposited $2,500.00 to Price's account at City Bank in Forney ending in 6372, and

b.          Nealy obtained $3,000.00 in cash.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted Paragraph 184 and 184a and b above and, therefore, denies same.

185.   On or about June 10, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $25,000.00 to her City Bank account ending in 8994 and took cash back of $2,500.00.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 185 above and, therefore, denies same.

186.   Nealy received other payments from Schlumberger for an approximate total of $251,000.00.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 186 above and, therefore, denies same.

187.   On or about July 24, 2002, one day before his purchase of 7001 Grady Niblo from Wayne White, Price received a transfer of $6,000.00 from a KLNA account at City Bank in Forney to his account there ending in 6372.

> **Response:** Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 187 above and, therefore, denies same.

188.  On or about August 19, 2002, Nealy deposited a check from Urban Related Development – Victory, payable to KLNA in the amount of $6,924.81 into Price's City Bank in Forney account ending in 6372.

a.          As part of this transaction, Nealy took back cash of $2,424.81 which she deposited into a KLNA account.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 188 and 188a above and, therefore, denies same.

189.  On or about September 11, 2002, Nealy split the deposit of a Wal-Mart check payable to KLNA in the amount of $12,000.00 and:

a.          put $3,000.00 of the money into the City Bank in Forney account of Price ending in 6372,

b.          took $2,000.00 of cash back, and

c.          put the balance of this money into a KLNA account.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted Paragraph 189 and 189a, b and c above and, therefore, denies same.

190.  On or about November 20, 2002, Price received a transfer of $15,000.00 from a KLNA account into his City Bank in Forney account ending in 6372.

> **Response:**  Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 190 above and, therefore, denies same.

191.   On or about January 7, 2003, Price deposited to his City Bank in Forney account ending in 6372 a Nealy/City Bank cashier's check payable to Sheriff Jim Bowles in the amount of $45,312.02.

a.             As part of this transaction, Price took cash out of $42,000.00.

   **Response:** Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 191 and 191a above and, therefore, denies same.

192.   On June 27, 2011, FBI agents found cash of $40,000.00 wrapped in City Bank cash straps dated on or just before January 7, 2003 in the safe at the residence of Price.

   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 192 above and, therefore, denies same.

193.   On or about May 6, 2003, Nealy obtained a personal loan and cashier's check payable to Sheriff Jim Bowles in the amount of $39,477.25 for the purchase of 2402 S. Lancaster Road.

a.             Nealy made the final payment on this loan on or about July 14, 2008.

   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 193 and 193a above and, therefore, denies same.

194.   **[REDACTED]**

   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 194 above and, therefore, denies same.

195. Beginning in or about January 2007, the tenant rent payments of approximately $1,200.00 per month for 2402 S. Lancaster were written to Price.

a.        These rent payments were usually cashed by or for Price at Dallas Telco.

> **Response:** Paragraph 195 and 195a are misleading because it ignores that the property was first purchased and then it had to be renovated.  The allegation appears to suggest that Price pocketed the money when, in fact, money was spent on renovations, foundation repairs and including the purchase of two other adjacent lots. Therefore, Claimant Price denies same.

196. On or about December 26, 2003, Nealy deposited a BearingPoint check payable to KLNA in the amount of $2,000.00 into her Bank of America account ending in 1364.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 196 above and, therefore, denies same.

197. On or about April 19, 2004, BearingPoint submitted a proposal to Dallas County for the Recording, Indexing, and Imaging System wherein KLNA was named as a partner with the firm for this project.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 197 above and, therefore, denies same.

198. On or about May 25, 2004, on a motion by Price, the DCCC adopted court order 2004-934 which authorized staff to proceed with the next phase of an RFP

evaluation which included BearingPoint as a designated firm for the Recording, Indexing, and Imaging System for the County Clerk.

> **Response:** The allegation in Paragraph 198 is misleading because all of the court orders are motioned and seconded by the same individual and voted on in unison. Accordingly, the procedure that the allegation assumes did not exist and, therefore, Claimant Price denies same.

199. On or about June 15, 2004, on a motion by Price, the DCCC adopted court order 2004-1034 which authorized acceptance of the Change of Control Event from Schlumberger to Atos and authorized the County Judge to sign an amendment to the affected IT contract.

> **Response:** The allegation in Paragraph 199 is misleading because all of the court orders are motioned and seconded by the same individual and voted on in unison. Accordingly, the procedure that the allegation assumes did not exist and, therefore, Claimant Price denies same.

200. On or about August 2, 2004, Nealy deposited an Atos check payable to KLNA in the amount of $10,000.00 to her Bank of America account ending in 1364.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 200 above and, therefore, denies same.

201. Atos continued to pay Nealy through in or about March 2007 in an approximate total amount of $234,000.00.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 201 above and, therefore, denies same.

202   On or about January 25, 2005, with an affirmative signature by Price, the DCCC adopted court order 2005-199 which rendered BearingPoint as the finalist for the Recording, Indexing, and Imaging System, and authorized staff to enter into contract negotiations.

> **Response:**  Paragraph 202 appears to contain an allegation that Price alone signed the document referred to when, in truth, the court order was signed off by all of the court.  Therefore, Claimant Price denies same.

203.   On or about March 29, 2005, with an affirmative signature by Price, the DCCC adopted court order 2005-658 to authorize the execution of a Software License and Professional Services Agreement with BearingPoint for the Recording, Indexing, and Imaging System.

> **Response:**  Paragraph 203 appears to contain an allegation that Price alone signed the document referred to when, in truth, the court order was signed off by all of the court.  Therefore, Claimant Price denies same.

204.   In or about May 2005 Nealy deposited two BearingPoint checks payable to KLNA in total amount of $5,000.00.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 204 above and, therefore, denies same.

205.   In total Nealy received $195,000.00 from BearingPoint through in or about February 2008.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 205 above and, therefore, denies same.

206. On or about December 27, 2006, Price deposited into a personal checking account a check from CMGRP payable to KLNA in the amount of $5,000.00.

a.        As part of this transaction, Price took cash back of $3,000.00.

**Response:** Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 206 and 206a above.   However, Price does not deny the transaction could have happened as alleged.

207. On or about May 1, 2007, Nealy deposited two checks from Hillwood entities in the total amount of $2,500.00, and wrote a check for that amount payable to Dallas Telco with the memo "Furniture" that was deposited into a personal account of Price at Dallas Telco.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 207 above and, therefore, denies same.

208. On or about May 7, 2007, Nealy deposited a check from a Hillwood entity in the amount of $2,500.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 208 above and, therefore, denies same.

209. On or about May 14, 2007, Nealy wrote a KLNA check payable to MMS Company in the amount of $4,563.44.

a.        Price deposited this check into one of his personal checking accounts.

**Response:** Due to the passage of time, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 209 and 209a above and, therefore, denies same.

210. MMS Company is an assumed name company registered by Fain in 2005.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 210 above and, therefore, denies same.

211. MMS had a bank account that had Price on the signature card with Fain.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 211 above and, therefore, denies same.

212. On or about May 19, 2007, Price deposited a Nealy check payable to him in the amount of $4,000.00.

a.          As part of this transaction, Price took cash back of $3,000.00.

**Response:** Claimant Price does not deny that the transaction did not occur but, because of the passage of time, cannot, under oath, either admit or deny Paragraph 212 and 212a.

213. On or about May 24, 2007, Price deposited a KLNA check payable to Lakeside Bank in the amount of $9,700.00 into one of his personal accounts.

a.          As part of this transaction, Price took cash back of $1,700.00.

**Response:** Claimant Price does not deny that the transaction did not occur but, because of the passage of time, cannot, under oath, either admit or deny.

214. On or about November 19, 2007, Nealy deposited a check from Bearing Point payable to KLNA in the amount of $4,000.00.

a.        Nealy then wrote a check payable to Dallas Telco in the amount of $1,000.00.

b.        Price deposited that same $1,000 check from Nealy into his personal account at Dallas Telco.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 214 and 214a. and b. above and, therefore, denies same.

215.  On or about July 27, 2010,   **[REDACTED]** requested and obtained a consulting contract for KLNA **[REDACTED]** that would pay Nealy $7,500.00 per month for six months.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 215 above and, therefore, denies same.

216.  On or about August 24, 2010, Price cashed a check from Nealy in the amount of $1,000.00 with the memo "Lancaster reimburse" along with a check from the tenant at 2402 S. Lancaster in the amount of $460.00.

**Response:**  Claimant Price admits Paragraph 216.

217.  On or about September 3, 2010, Price received and deposited a check from Nealy in the amount of $1,000.00 with the memo "Lancaster."

**Response:**  Claimant Price admits Paragraph 217.

218.  On or about October 25, 2010, Price cashed a check from Nealy in the amount of $2,700.00 with the memo "BMW repair."

**Response:**   Claimant Price admits Paragraph 218.

219.   On or about November 15, 2010, Price cashed a check from Nealy in the amount of $1,700.00 with the memo "BMW-Repair."

**Response:**   Claimant Price admits Paragraph 219.

220.   **[REDACTED]**

**Response:**   Claimant Price admits Paragraph 220.

221.   On or about January 7, 2011, Nealy deposited a CMGRP (for Wal-Mart) check payable to KLNA in the amount of $5,000.00, and wrote a check payable to Price in the amount of $2,100.00 with memo "Lancaster-Repair."

> **Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 221 above and, therefore, denies same.

222.   On or about March 25, 2011, Price cashed a check from Nealy in the amount of $1,000.00 for "Lancaster-Repair."

**Response:**   Claimant Price admits Paragraph 222.

223.   On or about April 17, 2011, the Dallas Morning News reported that Price had a "Mike Rawlings for Dallas Mayor" sign in the front yard of his home.

**Response:**   Claimant Price admits Paragraph 223.

224.   On or about April 21, 2011 Nealy deposited a $25,000.00 check from the Mike Rawlings Campaign into her "campaign account."

a.        The next day Nealy wrote a check from that account payable to her name in the amount of $5,000.00 for "consulting."

b.        This same $5,000 check was deposited by Price to his Dallas Telco account on April 30, 2011 and he took $2,500.00 cash back.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

225.   On or about May 2, 2011, the Dallas Morning News reported that Price had endorsed Rawlings on May 1, 2011.

> **Response:**  Claimant Price admits Paragraph 225.

226.   On or about May 7, 2011, Price cashed a check from Nealy in the amount of $1,000.00.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

227.   Affiant believes the foregoing facts support a reason to believe that Price, Nealy, and others corruptly conspired to promote the positions and interests of Price and Nealy, resulting in consulting contracts for Nealy from which Nealy provided a stream of benefits to Price in return for the use of his official position in support of her business and the objectives of her clients.

> **Response:**  Claimant Price is unable to respond to the allegations of what the FBI agent believes, and therefore denies same.

## Millennium 2000 Role in the 666 Conspiracy

228.   On or about October 1, 1999, Karen L. Manning opened 2 bank accounts in the name of Millennium 2000 Home Furnishings using the address of her employer in Cedar Hill, Texas.

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 228 above and, therefore, denies same.

229.   Beginning in or about October 2000, Millennium 2000 records reflect the ownership and/or sale of African art by Price.

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 229 above and, therefore, denies same.

230.   On or about October 19, 2001, Manning applied for a lease at Southside on Lamar listing Price as a reference.

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 230 above and, therefore, denies same.

231.   Most of the African art on display for sale at Millennium 2000 has been purchased and provided by Price.

>   **Response:**  Claimant Price denies Paragraph 231.

232.   Between 2001 and 2011 Price used cash to purchase in excess of $100,000.00 of African art from a Dallas area vendor.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegation asserted in Paragraphy 232 and, therefore, denies same.

233. Beginning on or about at least April 27, 2002, Manning and Price began to put on exhibits of African art owned and sold by or for Price.

**Response:** Claimant Price admits that he and Manning put on exhibits of African art and that there were sales. Price received a portion of the proceeds.

234. Manning would and did generally keep $45.00 for each piece of Price's art sold, and the balance was paid by Manning to Price.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 234 above and, therefore, denies same.

235. Beginning at least in or about February 2003, the Millennium guest registers showed guests that included persons with business at Dallas County including **[REDACTED]**and others.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 235 above and, therefore, denies same.

236. On or about October 1, 2003, **[REDACTED]** a contract with Manning for design and renovation work at her home in the amount of $23,750.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 236 above and, therefore, denies same.

237.  In or about October 2005 Price solicited H. Ross Perot to allow Manning to participate in the design work for the W Hotel.

> **Response:** The dictionary definition of "solicited" is broader than the Commissioner's conduct, therefore, the allegation is Paragraph 237 is denied.

238.  In or about February 2011 Price solicited an affordable housing developer for whom he had provided official support to allow Manning to install African art in a new development.

> **Response:** The dictionary definition of "solicited" is broader than the Commissioner's conduct, therefore, the allegation is Paragraph 237 is denied.

239.  Steve Mize is an employee under Price at Dallas County.

> **Response:**  Claimant Price admits Paragraph 239.

240.  Mize obtained a quote from a contractor working for Dallas County to provide some of the work under the contract between Manning and Sampson.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 240 above and, therefore, denies same.

241.  In or about November 2007 Mize solicited another Dallas County contractor for the installation of glass displays at Millennium.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

242. Beginning at least in or about September 30, 2004, Price began to use his campaign funds for the purchase of African art from Millennium to be given as gifts to constituents, campaign donors, and dignitaries.

**Response:** Claimant Price admits Paragraph 242.

243. Price benefitted from purchases made with campaign funds when the margin above the $45.00 fee was paid to him and converted to personal use.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 243 and, therefore, denies same.

244. A material amount of the campaign funds available for transactions with Millennium were:

a. solicited by Nealy and/or

b. contributed by persons and entities that had legislative matters and/or contracts with Dallas County.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted Paragraph 244 and sub-paragraphs a. and b. above and, therefore, denies same.

245. At least $70,000.00 of Price's campaign funds were used for payments to Millennium.

**Response:** Because of the lack of specificity, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 245 above and, therefore, denies same.

246.   Beginning in or about April 2008 Price began to have his annual Birthday Party fund raiser at the Millennium 2000 gallery.

   **Response:**   Claimant Price admits Paragraph 246.

247.   Beginning in or about at least 2008 Price began to use Millennium as a site and/or a caterer to host events charged to Dallas County.

   **Response:**   Claimant Price admits that these expenses were shared by most, if not all, of the commissioners, including Price; otherwise, denies Paragraph 247.

248.   Beginning in or about 2009 Price began to use Millennium as a middleman for the sale of goods from MMS Company to Dallas County.

   **Response:**   Claimant Price denies Paragraph 248.

249.   Between in or about June 2004 and May 2010 Karen Manning and/or Millennium made payments to Price in excess of $100,000.00.

   **Response:**   Claimant Price admits that Karen Manning made payments to him but is without sufficient knowledge to either admit or deny the amount alleged over the period of time alleged in Paragraph 249.

250.   Between on or about January 11, 2005, and at least December 1, 2006, over $60,000.00 of the payments from Manning or Millennium to Price were converted to cash.

   **Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 250 above and, therefore, denies same.

251.   Affiant believes the foregoing facts support a reason to believe that Price, Manning, and others conspired to use Millennium 2000 as a facility to launder cash and conceal income to Price, including income from monies solicited from persons and companies with business matters at Dallas County.   Millennium 2000 was further used to conceal the conversion to personal use of campaign funds obtained from those and other persons or entities with business matters at Dallas County.

> **Response:**  Claimant Price is unable to respond to the allegations of what the FBI agent believes and, therefore, denies Paragraph 251.

252.   In total, the payments from Nealy and Manning or Millennium that were converted to cash exceed the amount of cash that was found in the safe at the residence of Price.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 252 above and, therefore, denies same.

## Dapheny Fain and MMS Company (formerly Male Man Sales)

253.   In or about 2002 to 2003 Fain operated an entity named Male Man while also working full-time for Dallas County in the office of Price.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 253 above and, therefore, denies same.

254.   In or about January of 2005 Price had been in a personal relationship with a manager at Southwestern Bell Communications (SBC) for several years.

> **Response:**  Claimant Price denies Paragraph 254.

255.   When the SBC manager told Price she was looking for a new vendor, Price directed her to Fain as one who could fulfill the need.

   **Response:**  Claimant Price denies Paragraph 255.

256.   Price advised Fain that the manager would call her to discuss it.

   **Response:**  Claimant Price denies Paragraph 256.

257.   The manager called Fain and they met at a restaurant in the downtown area of Dallas to discuss the opportunity.

   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 257 above and, therefore, denies same.

258.   On or about January 24, 2005, Fain applied for minority certification for Male Man with the North Texas Regional Certification Agency (NTRCA).

a.      This application showed 2003 as the last year of active business for Male Man, and

b.      Manning as a company/client reference, **[REDACTED]**.

c.      **[REDACTED]**

   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 258 and its sub-paragraphs above and, therefore, denies same.

259.   On or about January 31, 2005, Fain opened a bank account at Lakeside National Bank ending in 0007 for Dapheny Fain doing business as Male Man Sales.

a.          Price was listed as the beneficiary and a convenience signer for this account.

>   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 259 above and, therefore, denies same.

260.   On or about February 8, 2005, Fain solicited a consultant and contractor to Dallas County for a bid on computers and televisions to be sold by Male Man Sales to SBC.

>   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 260 above and, therefore, denies same.

261.   On or about February 14, 2005, Fain sent a Male Man Sales invoice to SBC in the amount of $121,700.93 for computers and televisions.

>   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

262.   On or about February 22, 2005, Fain received and deposited to the Lakeside National Bank account ending in 0007 a check from SBC in the amount of $121,700.93.

>   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 262 above and, therefore, denies same.

263.   Between on or about February 22, 2005, and October 1, 2008, SBC/AT&T wrote checks for Male Man and MMS Company invoices in excess of $1,400,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 263 above and, therefore, denies same.

264.   On or about February 22, 2005, Fain also deposited to the Lakeside National Bank account ending in 0007 the $25,000.00 proceeds of a loan she obtained from Price at Lakeside National Bank.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted Paragraph 264 above and, therefore, denies same.

265.   On or about February 22, 2005, Fain obtained a cashier's check payable to Waterford Wedgewood USA in the amount of $20,000.00 from the Lakeside National Bank account ending in 0007.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 265 above and, therefore, denies same.

266.   Between February 22, 2005, and June 13, 2011, Price caused over 40 internal or checking transfers of funds from his personal accounts in excess of $432,970.00 to Male Man Sales accounts.

**Response:** Because the allegation involves over 40 transactions over a period of 7 years, Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same. However, he admits there were transactions.

267.   Between on or about March 11, 2005, and April 27, 2006, Fain made loan repayments to Price from the MMS Company account at Lakeside National Bank ending in 0007 of over $97,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 267 above and, therefore, denies same.

268.   Between on or about February 22, 2005, and December 4, 2008, Price caused 58 of the checks from SBC or AT&T to be split deposited between his personal accounts in the amount of $235,215.03 and the MMS Company accounts in the amount of $1,085,934.48.

**Response:** Claimant Price admits that there were transactions but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 268 above and, therefore, denies same.

269.   At the times of 9 deposits of the checks from SBC or AT&T from on or about July 27, 2005 to December 4, 2008 Price and Fain caused the taking of cash back in amounts just under $10,000.00 with each of those separate deposits.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 269 above and, therefore, denies same.

270.   In addition to the 9 deposits above, there were a number of lesser such deposits where a smaller amount of cash was taken back, the total of which is over $30,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 270 above and, therefore, denies same.

271.   Checks to MMS Company from other customers that were diverted to a personal account of Price totaled in excess of $45,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 271 above and, therefore, denies same.

272. Between in or about March 2005 and June 2011, Fain withdrew cash from MMS accounts other than from deposits in excess of $40,000.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 272 above and, therefore, denies same.

## MMS Transaction Showing Price Profit

273. In or about February 2010 through March 2010, MMS Company bid and sold laundry equipment to Prairie View A&M University in the amount of $17,768.00.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 273 above and, therefore, denies same.

274   On or about February 23, 2010, Price wrote a Dallas Telco check from his personal account in the amount of $14,000.00.

a.        Price then deposited this same check into an MMS account at Dallas Telco.

b.        Price then used the MMS account at Dallas Telco to obtain a cashier's check in approximately the same amount for the purchase of the laundry equipment for Prairie View A&M University.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 274 and its sub-paragraphs above and, therefore, denies same.

275.   On or about April 19, 2010, Price deposited a Prairie View A&M check payable to MMS Company in the amount of $17,768.00 into his personal account at Dallas Telco.

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 275 above and, therefore, denies same.

## Self Dealing Through MMS

276.   From in or about 2005 through 2010, Fain and Price have caused Kwanzaa Fest, Inc. to make purchases from MMS Company in excess of $120,000.00.

>   **Response:**  Claimant Price denies Paragraph 276.

277.   From in or about 2005 through 2010, clients of KLNA have been solicited by Nealy resulting in contributions of over $90,000.00 to Kwanzaa Fest.

>   **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 277 above and, therefore, denies same.

278.   From in or about 2006 through 2011, Price used his campaign account funds to make purchases from MMS Company in excess of $60,000.00.

>   **Response:**  Claimant Price admits that over the five-year period there were transactions with MMS, however, is without sufficient knowledge to quantify the amounts thereof and, therefore, denies the allegations in Paragraph 278.

279.   From in or about 2006 through 2011, clients of KLNA have been solicited by Nealy resulting in contributions of over $70,000.00 to the campaign.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 279 above and, therefore, denies same.

## Interview of Fain

280.   On June 27, 2011, concurrent with the execution of search warrants at the offices of Price, FBI agents interviewed Fain.

a.       Fain stated that Price had no role in the business of MMS.

b.       Fain stated that Price did conduct banking transactions for MMS.

c.       Fain stated that when Price conducted a bank transaction with cash back for MMS, he gave all of it to her and kept none.

d.       Fain stated that she used the cash taken back from deposits for business expenses such as gas, meals, and supplies.

e.       When asked if agents would find a large amount of cash in a safe at the residence of Price, Fain stated that she had a large amount of cash in a safe at his residence.

f.       Fain stated that she did not have any accounting of the money in the safe.

g.       Fain stated that she did not know the combination to the safe.

h.       Fain stated that Price had not transferred any of his money into a bank account of MMS.

   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 280 and its sub-paragraphs above and, therefore, denies same.

281.   Affiant believes that the foregoing facts support a reason to believe that Price and Fain have conspired to use Male Man Sales and MMS Company to generate and conceal income for Price.   Moreover, Price and Fain used MMS to convert monies for personal benefit from funds raised by Nealy in the Price campaign and Kwanzaa Fest accounts.   The records show that the business started with only $300.00.   Affiant believes that the evidence shows that Price advanced working capital obtained from funds that were corruptly obtained and accumulated.   He advanced the funds through various types of non-cash transfers from his personal accounts, and those amounts along with a reasonable return on investment were paid back largely via banking transactions from the receipts of MMS.   The financial records do not support a theory that Fain and MMS generated enough cash from income above and beyond what was required to pay Price back such that she could and did convert said income to cash sufficient to put "legitimate income" of $114,750.00 into the safe of Price.   To further refute the claim that 50% of the funds in the safe belonged to Fain, there was a lack of any record or segregation within the safe to show such a division.   Fain stated during her interview that she had no accounting of the funds at the time of the search and seizure.   Affiant asserts that such a split is either a random division or an agreed upon split of the corruptly obtained and concealed proceeds of a conspiracy.   In any event, the $229,590.00 in United States currency seized from a safe in the home of Dallas County Commissioner John Wiley Price would not have existed but for the undisclosed and illegal activities described in this affidavit.

**Response:** Claimant Price is unable to respond to the allegations of what the FBI agent believes and, therefore, denies Paragraph 281.

## Other Funds Available to Price

282.   Between in or about 2006 and 2011, Price received in excess of $500,000.00 in loans, gifts, and payments to third parties from a wealthy female friend.

a.        Approximately 80% of these checks were deposited into bank accounts held by Price or to an account for his benefit.

b.        A payment of $45,000.00 to a third party provided the balance of funds Price needed for the purchase of a 2005 Bentley automobile.

c.        A loan of $100,000.00 in March of 2011, less approximately $25,000.00 used in small increments for various expenses, was still in one of Price's bank accounts at the time of the FBI search warrants in June 2011.

d.        Other large sums were believed to have been used for the purchase of expensive watches and other gifts.

e.        Approximately $105,000.00 of the funds was converted to cash at or about the time of receipt by Price.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 282 and its sub-paragraphs above and, therefore, denies same.

## Personal Financial Disclosures

283.   Price is required by state law to file under oath an annual Personal Financial Disclosure with Dallas County.

**Response:** Claimant Price admits Paragraph 283.

284.   The disclosures are not publicly posted, but are available through a Freedom of Information Application to Dallas County.

**Response:**   Claimant Price denies Paragraph 284.

285.   On June 27, 2011, FBI agents executed a search warrant at the offices of the Dallas County Clerk to obtain the original filings of Price.

**Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 285 above and, therefore, denies same.

286.   The disclosure for 2000 filed on or about April 30, 2001 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

**Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 286 above and, therefore, denies same.

287.   The disclosure for 2001 file on or about May 28, 2002 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

**Response:**   Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 287 above and, therefore, denies same.

288.   The disclosure for 2002 filed on or about April 30, 2003 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 288 above and, therefore, denies same.

289.   The disclosure for 2003 filed on or about February 11, 2004 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.  It did begin to show ownership of the properties acquired with Wayne White as previously concealed by Fain.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 289 above and, therefore, denies same.

290.   The disclosure for 2004 filed on or about May 2, 2005 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 290 above and, therefore, denies same.

291.   The disclosure for 2005 filed on or about May 1, 2006 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 291 above and, therefore, denies same.

292.  The disclosure for 2006 filed on or about April 30, 2007 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 292 above and, therefore, denies same.

293.  The disclosure for 2007 filed on or about June 28, 2008 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 293 above and, therefore, denies same.

294.  The disclosure for 2008 filed on or about April 30, 2009 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 294 above and, therefore, denies same.

295.  No disclosure for 2009 was found in the file or turned over by the Dallas County Clerk pursuant to a subpoena.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 295 above and, therefore, denies same.

296.   The disclosure for 2010 filed on or about May 2, 2011 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 296 above and, therefore, denies same.

## IRS Financial Investigation

297.   As part of this investigation, the Internal Revenue Service has been analyzing Price's finances through a means test of his reported net income and expenditures.  Price's prior bankruptcy has been used as the starting point for the analysis as it establishes a known point in time when Price was required to declare all of his assets and living expenses.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 297 above and, therefore, denies same.

## Overview of Price's Income and Expenditures

298.   Price's U.S. Individual Income Tax Return for the year 1996 reflects a total available income of $51,323.12 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

> **Response:**  Claimant Price admits the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 298 above and, therefore, denies same.

299.  For 1996, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition.   Considering this amount of expenditures and the total available income for 1996 as stated above, Price's net available income totals negative <$15,684.88>.  This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 299 above and, therefore, denies same.

300.  Price's U.S. Individual Income Tax Return for the year 1997 reflects a total available income of $55,009.11 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

> **Response:**  Claimant Price admits the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 300 above and, therefore, denies same.

301.  For 1997, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition.   Considering this amount of expenditures and the total available income for 1997 as stated above, Price's net available income totals negative <$11,998.89>.  This investigation is ongoing and additional expenditures are expected to be identified.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 301 above and, therefore, denies same.

302.   Price's U.S. Individual Income Tax Return for the year 1998 reflects a total available income of $62,069.80 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

**Response:** Claimant Price admits the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 302 above and, therefore, denies same.

303.   For 1998, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition.   Considering this amount of expenditures and the total available income for 1998 as stated above, Price's net available income totals negative <$4,938.20>.   This investigation is ongoing and additional expenditures are expected to be identified.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 303 above and, therefore, denies same.

304.   Price's U.S. Individual Income Tax Return for the year 1999 reflects a total available income of $66,642.76 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

**Response:** Claimant Price admits the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 304 above and, therefore, denies same.

305. For 1999, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition. Considering this amount of expenditures and the total available income for 1999 as stated above, Price's net available income totals negative <$365.24>. This investigation is ongoing and additional expenditures are expected to be identified.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 305 above and, therefore, denies same.

306. Price's U.S. Individual Income Tax Return for the year 2000 reflects a total available income of $38,997.56 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

**Response:** Claimant Price admits the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 306 above and, therefore, denies same.

307. For 2000, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition. Considering this amount of expenditures and the total available income for 2000 as stated above, Price's net available income totals

negative <$28,010.44>.  This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 307 above and, therefore, denies same.

308.  Additionally, during the time period of 1996 through 2000, Price purchased seven Certificates of Deposit (CD) valued at more than $80,000.00.  Loan documents obtained during the investigation reveal the CDs were obtained sometime after 1996 and were utilized by Price as collateral on other loan applications as late as May 1, 2002.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 308 above and, therefore, denies same.

309.  Price's U.S. Individual Income Tax Return for the year 2001 reflects a total available income of $52,250.55 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

> **Response:** Claimant Price admits the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted above and, therefore, denies same.

310.  For 2001, expenditures were identified through financial records relating to loan payments in the amount of $35,963.89.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $18,262.13.  Considering these amounts of expenditures and the total available

income for 2001 as stated above, Price's net available income totals negative <$1,975.47>. This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 310 above and, therefore, denies same.

311.  Price's U.S. Individual Income Tax Return for the year 2002 reflects a total available income of $52,243.28 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

> **Response:** Claimant Price admits the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 311 above and, therefore, denies same.

312.  For 2002, expenditures were identified through financial records relating to loan payments in the amount of $40,697.99. Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $2,963.64. Considering these amounts of expenditures and the total available income for 2002 as stated above, Price's net available income totals $8,581.65.[1] This investigation is ongoing and additional expenditures are expected to be identified.

---

[1] This number and three others were mistakenly transcribed in the prior sealed affidavit as negative numbers which are now being corrected prior to unsealing.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 312 above and, therefore, denies same.

313.   Price's U.S. Individual Income Tax Return for the year 2003 reflects a total available income of $57,473.36 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

**Response:** Claimant Price admits that the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 313 above and, therefore, denies same.

314.   For 2003, expenditures were identified through financial records relating to loan payments in the amount of $33,904.95.   Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $10,833.40.   Considering these amounts of expenditures and the total available income for 2003 as stated above, Price's net available income totals $12,735.01.   This investigation is ongoing and additional expenditures are expected to be identified.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 314 above and, therefore, denies same.

315.   Price's U.S. Individual Income Tax Return for the year 2004 reflects a total available income of $33,131.23 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

**Response:**  Claimant Price admits that the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 315 above and, therefore, denies same.

316.  For 2004, expenditures were identified through financial records relating to loan payments in the amount of $4,250.20.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $13,759.94.  Considering these amounts of expenditures and the total available income for 2004 as stated above, Price's net available income totals $15,121.09. This investigation is ongoing and additional expenditures are expected to be identified.

**Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 316 above and, therefore, denies same.

317.  Price's U.S. Individual Income Tax Return for the year 2005 reflects a total available income of $63,316.85 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

**Response:**  Claimant Price admits that the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 317 above and, therefore, denies same.

318.  For 2005, expenditures were identified through financial records relating to loan payments in the amount of $14,381.02.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $10,794.46.  Considering these amounts of expenditures and the total available

income for 2005 as stated above, Price's net available income totals $38,141.37. This investigation is ongoing and additional expenditures are expected to be identified.

>   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 318 above and, therefore, denies same.

319.   Price's U.S. Individual Income Tax Return for the year 2006 reflects a total available income of $38,383.29 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

>   **Response:** Claimant Price admits that the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 319 above and, therefore, denies same.

320.   For 2006, expenditures were identified through financial records relating to loan payments in the amount of $41,655.75. Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $1,600.06. Considering these amounts of expenditures and the total available income for 2006 as stated above, Price's net available income totals negative <$4,872.52>. This investigation is ongoing and additional expenditures are expected to be identified.

>   **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 320 above and, therefore, denies same.

321.   Price's U.S. Individual Income Tax Return for the year 2007 reflects a total available income of $50,186.34 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

> **Response:**  Claimant Price admits that the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 321 above and, therefore, denies same.

322.   For 2007, expenditures were identified through financial records relating to loan payments in the amount of $85,593.78.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $9,396.33.   Considering these amounts of expenditures and the total available income for 2001 as stated above, Price's net available income totals negative <$44,803.77>.   This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 322 above and, therefore, denies same.

323.   Price's U.S. Individual Income Tax Return for the year 2008 reflects a total available income of $28,965.00 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

> **Response:**  Claimant Price admits that the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 323 above and, therefore, denies same.

324.  For 2008, expenditures were identified through financial records relating to loan payments in the amount of $40,014.59.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $5,360.14.  Considering these amounts of expenditures and the total available income for 2001 as stated above, Price's net available income totals negative <$16,409.73>.  This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 324 above and, therefore, denies same.

325.  Price's U.S. Individual Income Tax Return for the year 2009 reflects a total available income of $32,792.00 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

> **Response:**  Claimant Price admits that the tax returns speak for themselves but is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 325 above and, therefore, denies same.

326.  For 2009, expenditures were identified through financial records relating to loan payments in the amount of $38,814.51.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $2,121.95.  Considering these amounts of expenditures and the total available income for 2001 as stated above, Price's net available income totals negative

<$8,144.46>.   This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 326 above and, therefore, denies same.

327.   To date, there has been no 2010 U.S. Individual Income Tax Return filed by Price.  In keeping with methods utilized in prior years, Form W-2 filed with the Internal Revenue Service relating to Price, and prior year income tax refund  reflect net wages after payroll deductions in the amount of  $94,184.00.

> **Response:** Claimant Price admits that the tax return has not been filed but, otherwise, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 327 above and, therefore, denies same.

328.   For 2010, expenditures were identified through financial records relating to loan payments in the amount of $100,652.36.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $4,505.30.   Considering these amounts of expenditures and the total available income for 2010 as stated above, Price's net available income totals negative <$10,973.66>.   This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 328 above and, therefore, denies same.

## Overview of Fain's Income and Expenditures

329.   Fain's U.S. Individual Income Tax Return for the year 2005 reflects a total available income of   $57,406.49 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds or payments she may have received or paid during the year.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 329 above and, therefore, denies same.

330.   For 2005, expenditures were identified through financial records relating to loan principle payments in the amount of $8,553.29.   Considering these expenditures and the total available income for 2005 as stated above, Fain's net available income totals $48,853.20.   This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 330 above and, therefore, denies same.

331.   Fain's U.S. Individual Income Tax Return for the year 2006 reflects a total available income of   $35,349.25 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds or payments she may have received or paid during the year.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 331 above and, therefore, denies same.

332.   For 2006, expenditures were identified through financial records relating to loan principle payments in the amount of $11,707.24.  Considering these amounts of

expenditures and the total available income for 2006 as stated above, Fain's net available income totals $23,642.01. This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 332 above and, therefore, denies same.

333. Fain's U.S. Individual Income Tax Return for the year 2007 reflects a total available income of $55,948.20 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds she may have received during the year.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 333 above and, therefore, denies same.

334. For 2007, expenditures were identified through financial records relating to loan principle payments in the amount of $11,801.28. Considering these amounts of expenditures and the total available income for 2007 as stated above, Fain's net available income totals $44,146.92. This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 334 above and, therefore, denies same.

335. Fain's U.S. Individual Income Tax Return for the year 2008 reflects a total available income of negative <$24,814.00> after considering payroll expenses and

all deductions claimed on schedules included with the tax return, as well as any income tax refunds or payments she may have received or paid during the year.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 335 above and, therefore, denies same.

336. For 2008, expenditures were identified through financial records relating to loan principle payments in the amount of $11,239.18. Considering these amounts of expenditures and the total available income for 2008 as stated above, Fain's net available income totals negative <$36,053.18>. This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 336 above and, therefore, denies same.

337. Fain's U.S. Individual Income Tax Return for the year 2009 reflects a total available income of $5,710.00 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds or payments she may have received or paid during the year.

> **Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 337 above and, therefore, denies same.

338. For 2009, expenditures were identified through financial records relating to loan principle payments in the amount of $7,172.69. Considering these amounts of expenditures and the total available income for 2009 as stated above, Fain's net

available income totals negative <$1,462.69>.  This investigation is ongoing and additional expenditures are expected to be identified.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 338 above and, therefore, denies same.

339.  To date, there has been no 2010 U.S. Individual Income Tax Return filed by Fain.  In keeping with methods utilized in prior years, Form W-2 and other information returns filed with the Internal Revenue Service relating to Fain, and prior year income tax refund, reflect net wages after payroll deductions in the amount of $48,195.00.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 339 above and, therefore, denies same.

## Fain and MMS Overdrafts

340.  A review of financial records pertaining to Fain and MMS reveals a large amount of charges for overdraft fees and insufficient funds.

> **Response:**  Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 340 above and, therefore, denies same.

341.  For the period 2005 through 2011, Fain's business (MMS) and personal accounts combined reflect more than 400 instances of bank fees relating to insufficient funds.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 341 above and, therefore, denies same.

342. For the period 2005 through 2011, charges to Fain's personal and business accounts totaled approximately $7,000.00 and $5,500.00, respectively.

**Response:** Claimant Price is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 342 above and, therefore, denies same.

343. Affiant believes these charges reflect and confirm that Fain did not have any ownership interest in large sums of cash stored in the safe of Price or anywhere else.

**Response:** Claimant Price cannot know what Affiant believes, therefore, is without sufficient knowledge to either admit or deny the specific allegations asserted in Paragraph 343 above and, therefore, denies same.

## CONCLUSION

344. Affiant submits that the above facts and circumstances support a reasonable belief that the Government will be able to meet its burden of proof at a civil trial on this matter to show that the Defendant properties of $229,590.00 in United States currency seized from a safe in the home of Dallas County Commissioner John Wiley Price and $230,763.47 from Dallas County Commissioner John Wiley Price's sale of 7001 Grady Niblo Road, Dallas Texas are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C). The properties have been involved in a multi-faceted conspiracy involving, Price, Fain, and others whereby they conspired to commit money laundering and to engage in monetary transactions in property

derived from specified unlawful activity in violation of 18 U.S.C. § 1956(h) and conspiracies to violate 18 U.S.C. § 152 [Bankruptcy Fraud] and 18 U.S.C. § 666 [Theft or Bribery Concerning Programs Receiving Federal Funds]. Moreover, Price, Fain, and others have used their legitimate sources of income to hide and disguise this money laundering by commingling their legitimate income with their illegal income so that their legitimate income is now substantially involved in the conspiracy to commit money laundering and to engage in monetary transactions in property derived from specified unlawful activity.

**Response:** Claimant Price denies all of the allegations in Paragraph 344.

345.  Affiant further believes the foregoing facts support a reasonable belief that Price and Fain conspired to enable Price to knowingly and fraudulently make false oaths in relation to his bankruptcy case while concealing the existence and/or true nature of ownership by Price of property that should have been included in Price's bankruptcy estate which Price and his conspirator(s) converted to different forms while his bankruptcy proceedings were still pending thereby defrauding or attempting to defraud his creditors, the bankruptcy court, title companies, and banks.

**Response:** Claimant Price cannot know what Affiant believes, therefore, is without sufficient knowledge to either admit or deny the specific allegations asserted Paragraph 345 above and, therefore, denies same.

346.  The facts and circumstances recited in this affidavit also support a reasonable belief that Price corruptly solicited or demanded for the benefit of other

persons connected to him to accept and agree to accept items of value of $5,000.00 or more from persons and entities having business before Dallas County while intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of Dallas County.

> **Response:** Claimant Price denies all of the allegations contained in Paragraph 346.

## Affirmative and Further Defenses

a.   Plaintiff has failed to state a claim for which relief can be granted.

b.   Some or all of Plaintiff's claims are barred or limited by applicable limitations periods.

c.   Claimant, at all times, acted in good faith and did not act knowingly.

d.    Claimant acted by a result of accident and/or mistake, and did not act knowingly.

e.    The seizure of the funds alleged in the Complaint was undertaken in violation of Claimant's Constitutional rights, including, but not limited to, the Fourth Amendment's prohibition against unreasonable searches and seizures, as well as Fed. R. Crim. P. 41.

f.    The seizure of the funds alleged in the Complaint was undertaken in violation of Claimant's Constitutional rights, including, but not limited to, the Eighth Amendment's prohibition against excessive fines.

g.    Claimant further states that Plaintiff cannot prevail on its claims because they are not consistent with applicable principles of equity.

h.    Claimant reserves the right to add additional affirmative defenses upon substantial completion of discovery.

## Jury Demand

Claimant John Wiley Price respectfully requests a jury be empanelled to try the facts and issues of this case.

## Request for Relief

For the reasons presented herein, Claimant John Wiley Price respectfully asks the Court to enter judgment that Plaintiff take nothing, dismiss Plaintiff's suit with prejudice, assess costs against Plaintiff, and award Claimant John Wiley Price all other relief to which he is entitled, both at law and at equity, including the award of

his attorneys' fees and costs, as well as the return of his property which was unlawfully taken from him.


Respectfully submitted,

**RAVKIND & ASSOCIATES, LLC**


  /s William M. Ravkind

William M. Ravkind
State Bar No. 16587300
BRavkind@JohnHCarney.com
One Meadows Building
5005 Greenville Avenue, Suite 200
Dallas, Texas 75206
(214) 559-0555 – Telephone
(214) 363-9979 – Facsimile

**Attorney for Claimant**


## CERTIFICATE OF SERVICE

    I hereby certify that on the 11th day of October, 2012, I caused to be electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means. Assistant United States Attorney Walt Junker has also been served with a copy of this claim.


  /s William M. Ravkind

William M. Ravkind