IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 3:12-CV-893-D |
| | § | |
| $229,590.00 in United States Currency | § | |
| Seized from a Safe in the Home of | § | |
| Dallas County Commissioner | § | |
| John Wiley Price | § | |
| | § | |
| $230,763.47 from Dallas County | § | |
| Commissioner John Wiley Price's Sale | § | |
| of 7001 Grady Niblo Road, Dallas, | § | |
| Texas, | § | |
| | § | |
| Defendants *In Rem.* | § | |

ANSWER TO FIRST AMENDED COMPLAINT FOR FORFEITURE *IN REM*
AND RESPONSES TO FIRST AMENDED VERIFICATION AFFIDAVIT

Dapheny Fain, Claimant, by and through the undersigned counsel, makes and files this her Answer to the Plaintiff United Sates of America's First Amended Complaint for Forfeiture *In Rem* and Responses to First Amended Verification Affidavit, in support thereof, would respectfully show unto the Court the following:

1.     Claimant does not dispute the legal contentions in paragraph 1 as to the cited provisions of 18 USC and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions providing for the type of relief requested in the complaint.  Claimant denies that the contents of the safe, which are the subject of this action (hereinafter, the "Property"), should be subject to forfeiture under any theory of Plaintiff.

2.      Claimant admits the allegations of jurisdiction in paragraph 2 of the complaint.

3.      Claimant does not dispute the legal contentions in paragraph 3 of the complaint, but denies that the Property should be subject to forfeiture under any theory of Plaintiff.

4.      Claimant admits the allegations of venue in paragraph 4 of the complaint.

5.      Claimant admits the allegations contained in sub-paragraph 5(a) of the complaint. Claimant lacks information sufficient to either admit or deny the allegations contained in sub-paragraph 5(b) of the complaint.

6.      Claimant lacks information sufficient to either admit or deny the allegations contained in paragraph 6 of the complaint.

7.      Claimant lacks information sufficient to either admit or deny the allegations contained in paragraph 7 of the complaint.

8.      Claimant lacks information sufficient to either admit or deny the allegations contained in paragraph 8 of the complaint.

9.      Claimant lacks information sufficient to either admit or deny the allegations contained in paragraph 9 of the complaint.

10.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 10 of the complaint that direct notice of the administrative forfeiture was sent to John Wiley Price and Price's attorney William M. Ravkind.  Claimant admits that notice was sent to Claimant and Claimant's attorney.

11.     Claimant lacks information sufficient to either admit or deny the allegations contained in paragraph 11 of the complaint.

12.     Claimant admits the allegations contained in paragraph 12 of the complaint.

13.     Claimant lacks information sufficient to either admit or deny the allegations contained in paragraph 13 of the complaint.

14.     Claimant admits the allegations contained in paragraph 14 of the complaint.

15.     Claimant admits the allegations contained in the first sentence of paragraph 15 of the complaint.  Claimant lacks information sufficient to either admit or deny the sentiment alleged before the comma in the allegations contained in the second sentence of paragraph 15 of the complaint.  Claimant admits the allegations contained after the comma in the second sentence of paragraph 15 of the complaint.

16.     Claimant admits the allegations contained in paragraph 16 of the complaint, but does not address the allegations contained in footnote 3.  Claimant admits that Plaintiff made copies of documents available to Claimant on or about July 29, 2011 and, again, on or about March 12, 2012 as alleged in footnote 3 to paragraph 16 of the complaint.  Claimant lacks information sufficient to either admit or deny the balance of the allegations contained in footnote 3 to paragraph 16 of the complaint.

17.     Claimant lacks information sufficient to either admit or deny the allegations contained in the first sentence of paragraph 17 of the complaint.  Claimant admits the balance of the allegations contained in paragraph 17 of the complaint.

18.     Claimant admits the allegations contained in paragraph 18 of the complaint.

19.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 19 of the complaint.

20.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 20 of the complaint.

21.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 21 of the complaint.

22.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 22 of the complaint.

23.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 23 of the complaint.

24.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 24 of the complaint.

25.     Claimant lacks information sufficient to either admit or deny the allegations in paragraph 25 of the complaint.

26.     Claimant denies the allegations in paragraph 26 of the complaint.

27.     Claimant denies the allegations in paragraph 27 of the complaint.

28.     Claimant denies the allegations in paragraph 28 of the complaint.

29.     To the extent that the <u>CLAIM FOR RELIEF</u> is a prayer and request for relief, such need neither be admitted denied.  To the extent that the <u>CLAIM FOR RELIEF</u> contains allegations or averments requiring responsive pleading, Claimant denies said allegations or averments.

FIRST DEFENSE

30.     Claimant moves the Court to dismiss the complaint for the reason that the Plaintiff fails to state a claim upon which relief may be granted.  FRCP 12(b)(6).

SECOND DEFENSE

31.     Claimant moves the Court to dismiss the complaint for the reason that Plaintiff's complaint is so vague or ambiguous that the Claimant cannot frame a responsive pleading. FRCP 12(e).  Specifically, the complaint fails to aver the facts supporting a reasonable belief that

the Government will be able to prove at trial that the Property is subject to forfeiture.  FRCP 10(c).

### THIRD DEFENSE

32.     Claimant moves the Court to dismiss the complaint as the complaint fails to allege facts that show the particulars of time, place, or contents of alleged false representations, conspiracy to commit money laundering, conspiracy to engage in monetary transactions in property derived from specified unlawful activity, bankruptcy fraud, and/or theft or bribery concerning programs receiving federal funds.  FRCP 9.  Claimant would further show that the complaint fails to allege facts demonstrating predicate acts, including allegations respecting the making and content of any false representations, the identity of who made the representations, what they obtained thereby, or the necessary details supporting the predicate acts of theft, conspiracy and fraud.

### FOURTH DEFENSE

33.     Claimant moves the Court to dismiss the complaint because Claimant is an innocent owner of the Property subject of this forfeiture complaint if any crime was committed by someone else.

WHEREFORE, PREMISES CONSIDERED, Claimant respectfully prays that this matter be dismissed upon the grounds alleged herein, alternatively that Plaintiff be required to re-plead the complaint in accordance with the FRCP, that the Property be released to Claimant immediately, that Claimant be awarded reasonable interest on the Property, that Claimant be awarded her reasonable attorney's fees, and for such other and further relief as deemed appropriate.

RESPONSES TO FIRST AMENDED VERIFICATION AFFIDAVIT

**FACTS SUPPORTING FORFEITURE**

**The Seizure of the $229,590.00**

1.      On June 27, 2011, at approximately 9 a.m., FBI agents executed a search warrant at 510 E. 5th Street in Dallas County, Dallas, Texas.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one of the Verification Affidavit.

2.      510 E. 5th Street in Dallas County, Dallas, Texas is the primary residence of John Wiley Price who is the sole resident there.

      Response:      FAIN admits the allegations in paragraph two of the Verification Affidavit.

3.      Within the house, agents located a safe containing $229,590.00 in United States currency.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph three of the Verification Affidavit.

4.      The safe also contained jewelry and numerous expensive watches with brands such as Jacob & Co., Icelink, Breitling, Marc Jacobs, Versace, Chanel, Corum Boutique, Cartier, Rolex, Technolex, Glashutte, Philip Stein, Le Vian, and Joe Rodeo.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph four of the Verification Affidavit.

5.      Both the cash and the watches were seized as evidence and the cash was referred for administrative forfeiture proceedings.

       Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph five of the Verification Affidavit.

## The Seizure of the $230,763.47

6.      On December 19, 2011, FBI agents executed a federal seizure warrant at 2450 North I-35E in Lancaster, Texas to obtain a $50,000.00 payment from W.O. Henry to John Wiley Price after Price appeared to close on a sale of 7001 Grady Niblo Road, Dallas, Texas to Henry.

       Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph six of the Verification Affidavit.

7.      Republic Title later ordered a revised closing on the 7001 Grady Niblo property when it learned of monies that Price and Henry had negotiated outside of their closing.

       Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph seven of the Verification Affidavit.

8.      As part of the revised closing, all undisclosed purchase monies had to be wired to the title company prior to the revised closing.

       Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph eight of the Verification Affidavit.

9.      On March 18, 2012, FBI agents served a seizure warrant on Republic Title for all proceeds due to John Wiley Price from the sale of the 7001 Grady Niblo property.

       Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph nine of the Verification Affidavit.

10.     The prior $50,000.00 remained seized and additional funds of $180,763.47 were seized on March 23, 2012 from Republic Title at 2626 Howell Street, Dallas, Texas 75204.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph ten of the Verification Affidavit.

**Administrative Forfeiture**

11.    The FBI initiated administrative forfeiture proceedings against the $229,590.00 in United States currency seized from a safe in the home of Dallas County Commissioner John Wiley Price.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph eleven of the Verification Affidavit.

12.    On August 25, 2011, a notice of the administrative forfeiture stating the exact amount of money seized from the safe was sent to Price, his attorney William M. Ravkind, Dapheny Fain and her attorney Tom Mills.  The notices to Price and Fain were unclaimed.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph twelve of the Verification Affidavit.

13.    On September 27, 2011, John Wiley Price filed a claim, under oath, in the administrative forfeiture proceedings whereby he claimed ownership of $115,000.00 of the $229,590.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph thirteen of the Verification Affidavit.

14.    Price also claimed an interest in the remaining $114,590.00 but purported to be merely a "custodian" of those funds for Dapheny E. Fain.  He asserted that Dapheny Fain would file a separate administrative claim.

Response:      FAIN admits the allegations in paragraph fourteen of the Verification Affidavit.

15.   Accompanying Price's administrative claim was a letter from his attorney William M.

Ravkind with various banking records.

Response:   FAIN lacks sufficient knowledge as to the allegations in paragraph

fifteen of the Verification Affidavit.

16.   As Price's legally authorized agent, Mr. Ravkind claimed in the letter that the

$229,590.00 resulted from various cash withdrawals and loan proceeds some of which

were contained in the banking records and constituted "the assets of legitimate businesses

and business activity."

Response:   FAIN lacks sufficient knowledge as to the allegations in paragraph

sixteen of the Verification Affidavit.

17.   On September 28, 2011, Dapheny E. Fain also filed an administrative claim in which she

recited, under oath, Price's claim that she owned $114,590.00 of the funds in the safe.

Response:   FAIN admits that she filed an administrative claim, as stated in

paragraph seventeen of the Verification Affidavit, but denies paragraph seventeen's

characterization of the administrative claim.

18.   Fain asserted that the $114,590.00 she claimed represented "the legal proceeds of my

business."

Response:   FAIN admits the allegations in paragraph seventeen of the

Verification Affidavit.

19.   Once the FBI received these claims, the administrative forfeiture proceedings were ended

against the $229,590.00 and the claim was forwarded to the United States Attorney's

Office in the Northern District of Texas for the judicial forfeiture process.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph nineteen of the Verification Affidavit.

20.     The FBI later initiated administrative forfeiture proceedings against the $50,000.00 from Dallas County Commissioner John Wiley Price's sale of 7001 Grady Niblo Road, Dallas Texas.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph twenty of the Verification Affidavit.

21.     On February 16, 2012, a notice of the administrative forfeiture was sent to Price, his attorney William M. Ravkind, and Henry Building Incorporated.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-one of the Verification Affidavit.

22.     On March 22, 2012, John Wiley Price filed a claim, under oath, in the administrative forfeiture proceedings whereby he claimed ownership of the $50,000.00.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-two of the Verification Affidavit.

23.     The FBI then ended the administrative forfeiture proceedings against the $50,000.00 and the claim was forwarded to the United States Attorney's Office in the Northern District of Texas for the judicial forfeiture process.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-three of the Verification Affidavit.

24.     The FBI also initiated administrative forfeiture proceedings against the $180,763.47 from Dallas County Commissioner John Wiley Price's sale of 7001 Grady Niblo Road, Dallas Texas.

   Response:  FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-four of the Verification Affidavit.

25. On April 27, 2012, a notice of the administrative forfeiture was sent to Price, William M. Ravkind, Henry Building Incorporated, its attorney Terri Moore, and Republic Title through its attorney Peter Graf.

   Response:  FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-five of the Verification Affidavit.

26. To date Price has not filed a claim to the $180,763.47.  His deadline to file a claim is June 1, 2012.

   Response:  FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-six of the Verification Affidavit.

### **Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h)**

27. As shown below, Price and others have conspired for Price to accumulate assets far beyond his disclosed means to save and/or pay for same since at least in or about 1995, the total value and nature of which cannot be accounted for but for the undisclosed and illegal income detailed below.

   Response:  FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-seven of the Verification Affidavit, and denies the allegations in paragraph twenty-seven to the extent that they apply to her.

28. Through numerous transactions at several financial institutions, Price and others have purposefully converted a high percentage of undisclosed income streams into cash or cash equivalents at or about the time of receipt.  Many times this cash conversion has

been structured to avoid a currency transaction report (CTR), and it has not appeared as a deposited balance in any known account.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-eight of the Verification Affidavit, but denies the allegations in paragraph twenty-eight to the extent that the allegations apply to her.

29.     Price and others have also at times commingled undisclosed and illegal income with legitimate income in order to make it more difficult to trace their activities.  Thus, like most money launderers, Price and his conspirators have commingled legal income with illegal income in order to mask, hide, and aid the money laundering conspiracy.  All of Price's "legitimate" income and/or use of legitimate bank accounts is therefore substantially connected to and involved in the money laundering conspiracy.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph twenty-nine of the Verification Affidavit, but denies the allegations in paragraph twenty-nine to the extent that the allegations apply to her.

### **Bankruptcy**

30.     On April 12, 1996, John Wiley Price filed a Chapter 7 bankruptcy petition number 396-32420 under the name "John Wiley Price III."

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph thirty of the Verification Affidavit.

31.     Price's declaration of assets totaled $339,080.79.

a.  The $339,080.79 included the $289,336.26 in exempted property listed below.

Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-one of the Verification Affidavit.

32.    The bankruptcy proceedings lasted until May 11, 2001.

Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-two of the Verification Affidavit.

33.    The bankruptcy proceedings resulted in a discharge of approximately $372,022.53 to the benefit of John Wiley Price.

Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-three of the Verification Affidavit.

34.    The bankruptcy proceedings permitted Price to retain the following exempted property valued in total at $289,336.26:

  a.  Homestead located at 406 E Fifth Street, Dallas, Texas valued at $100,000.00.

  b.  Furnishings and collections of watches, cufflinks, and African art valued at $23,400.00.

  c.  Clothing valued at $700.00.

  d.  Other jewelry valued at $420.00.

  e.  A shotgun and pistol valued at $150.00.

  f.  Golf clubs valued at $100.00.

  g.  Life insurance policy valued at $13,000.00.

  h.  Retirement plan valued at $130,536.26

  i.  1948 Pontiac valued at $15,000.00.

Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-four (a), (b), (c), (d), (e), (f), (g), (h), and (i) of the Verification Affidavit.

35. The bankruptcy proceedings did not exempt:

    a. $1,400.00 in cash declared on hand and in banks,

    b. an investment in stock,

    c. several accounts receivable,

    d. three additional automobiles or parts thereof.

    <u>Response</u>:    FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-five (a), (b), (c), and (d) of the Verification Affidavit.

### <u>Conspiracy to Commit Bankruptcy Fraud</u>

36. Affiant believes the following facts will show that John Wiley Price and Dapheny Fain conspired to hide certain assets of Price through the use of a bank account concealed in the name of another person and through a contract with a third party wherein Fain was the nominee partner for Price.  Together they obtained the assistance of third parties to cause real estate title and loan records to omit disclosure of the interests held by Fain for the benefit of Price.  In so doing, they were able to conceal the existence of these assets from creditors and the bankruptcy court until such time as the bankruptcy was terminated five years later.  The facts will show that Price and Fain then began to open new bank accounts under Price's true name with previously concealed monies, and to transfer title of the real properties and/or proceeds of the sale of real properties held by Fain to Price.

    <u>Response</u>:    FAIN denies the allegations in paragraph thirty-six of the Verification Affidavit.

37. On or about August 4, 1995, Price signed a signature card to open checking account ending in 6372 at Farmer's National Bank in Forney, Texas.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-seven of the Verification Affidavit.

38.     Price opened the checking account ending in 6372 at Farmer's National Bank in Forney, Texas under the name of his mother, [REDACTED].

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-eight of the Verification Affidavit.

39.     Price was the sole signer on the account ending in 6372.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph thirty-nine of the Verification Affidavit.

40.     The signature card for the account ending in 6372 does not contain a tax identification number.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph forty of the Verification Affidavit.

41.     When Price opened the account ending in 6372, [REDACTED] still had a checking account in her name which had been open since 1985.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph forty-one of the Verification Affidavit.

42.     On or about April 12, 1996, when John Wiley Price filed his Chapter 7 bankruptcy petition (case number 396-32420), he signed and filed it under oath in the name "John Wiley Price III."

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph forty-two of the Verification Affidavit.

43.     On or about April 29, 1996, John Wiley Price personally signed and filed several official bankruptcy documents under oath with the name "John Wiley Price III."

          Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph forty-three of the Verification Affidavit.

44.     During the course of the investigation affiant has confirmed that John Wiley Price III is not Price's true name, and these documents represent the only known use of this name by Price.

          Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph forty-four of the Verification Affidavit.

45.     At least one of those bankruptcy documents required Price to disclose all of his assets at that time, and any transfers of assets that had occurred during the preceding 12 months.

          Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph forty-five of the Verification Affidavit.

46.     Price did not disclose to the bankruptcy court that he had sole control of an account opened in the name of his mother 8 months prior to his filing.

          Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph forty-six of the Verification Affidavit.

47.     Price did not disclose to the bankruptcy court the existence of a safe deposit box under his control at Farmer's National Bank in Forney.

          Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph forty-seven of the Verification Affidavit.

48.     On or about June 28, 1996, Dapheny Fain opened a checking account ending in 3231 at Farmer's National Bank in Forney, Texas.

> Response:     FAIN lacks sufficient knowledge as to the date and bank account number alleged in paragraph forty-eight of the Verification Affidavit, but admits the allegation in paragraph forty-eight that she opened a checking account at Farmer's National Bank in Forney, Texas.

49.   On or about November 29, 1996, Fain opened an account at Common Ground Community Credit Union.

> Response:     FAIN lacks sufficient knowledge as to the date alleged paragraph forty-nine of the Verification Affidavit, but admits the allegation in paragraph forty-nine that she opened an account at Common Ground Community Credit Union.

50.   Fain opened the Common Community Credit Union account on November 29, 1996, with an application showing:

    a.   Price as her employer and

    b.   naming Price as the account beneficiary payable upon death.

> Response:     As to the allegations in paragraph fifty of the Verification Affidavit, FAIN is uncertain as to the date; but does admit paragraphs (a) and (b).

51.   On or about January 9, 1997, Price caused his campaign fund to provide a payment of $13,661.47 to Palmer & Palmer.

> Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph fifty-one of the Verification Affidavit.

52.   Price had his campaign fund report the $13,661.47 payment to Palmer & Palmer as a payment of a settlement to the bankruptcy court.

> Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph fifty-two of the Verification Affidavit.

53.     Fain was the campaign treasurer of Price's campaign fund at the time the $13,661.47

payment to Palmer & Palmer was made and reported.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph

fifty-three of the Verification Affidavit.

54.     On or about March 6, 1998, Kathy L. Nealy filed an assumed name record with Dallas

County doing business as Kathy L. Nealy & Associates (KLNA).

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph

fifty-four of the Verification Affidavit.

55.     At the time she formed KLNA, Kathy L. Nealy had been the campaign manager for Price

since at least in or about 1985.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph

fifty-five of the Verification Affidavit.

56.     Between on or about October 30, 1998 and March 9, 1999, title and loan records show

that Wayne White borrowed money at Lakeside National Bank in Rockwall, Texas.

    a.   Wayne White used this money to purchase three properties from D.L. Faulkner.

    b.   The three purchased properties had been under a lien held by the FDIC pursuant

      to a criminal forfeiture judgment.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph

fifty-six (a) and (b) of the Verification Affidavit.

57.     The three properties purchased with the money borrowed from Lakeside National Bank

in Rockwall, Texas between on or about October 30, 1998 and March 9, 1999 were:

    a.   The property identified on Grady Niblo Road is a parcel of approximately 9 acres

      more specifically known to have the address of 7001 Grady Niblo Road.

b. The property identified at 635 and I-30 is a tract known to have the address of 16800 LBJ Freeway in Dallas.

c. The property identified as a "certain identified Trinity property" is a tract known to have the address of 7424 Fairport Road in Dallas.

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph fifty-seven (a), (b), and (c) of the Verification Affidavit.

58. Lakeside National Bank records reflect that Price was considered to be a co-borrower with Wayne White for the money White borrowed at Lakeside National Bank in Rockwall, Texas to purchase the three properties.

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph fifty-eight of the Verification Affidavit.

59. Price's name was omitted from the title and loan records required to purchase the three properties.

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph fifty-nine of the Verification Affidavit.

60. The loan officer at Lakeside National Bank was unaware that anyone other than White had an interest in the titles to the properties that were used as collateral for the loans.

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph sixty of the Verification Affidavit.

61. Despite the omission of Price's name from the title and loan records, Price made payments against the Lakeside National Bank note(s) in White's name.

<u>Response</u>:       FAIN lacks sufficient knowledge as to the allegations in paragraph sixty-one of the Verification Affidavit.

62.       On or about April 4, 1999, Fain signed a contractual agreement with Wayne White.

    a.   Fain and White signed the contract together doing business as John Wayne Properties.

    b.   The contract was signed to express "an equally divided (50%) arrangement between the parties" for the purchase and ownership of the three properties listed above which White had purchased with money borrowed at Lakeside National Bank in Rockwall, Texas.

    c.   Notes to the agreement called for a 20% down payment.

    <u>Response</u>:       FAIN admits the allegations in paragraph sixty-two (a) and (b) of the Verification Affidavit and has insufficient knowledge as to the allegations in paragraph sixty-two (c).

63.       The April 4, 1999 agreement between Dapheny Fain and Wayne White was witnessed by Caryn Fain.

    <u>Response</u>:       FAIN admits the allegations in paragraph sixty-three of the Verification Affidavit.

64.       The April 4, 1999 agreement between Dapheny Fain and Wayne White was witnessed by Debra White.

    <u>Response</u>:       FAIN admits the allegations in paragraph sixty-four of the Verification Affidavit.

65.       The contractual agreement between Fain and White was not filed as a public record.

Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph sixty-five of the Verification Affidavit.

66.     After the April 4, 1999 agreement between Fain and White, the title to the properties was recorded only in the name of White.

Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph sixty-six of the Verification Affidavit.

67.     On or about January 20, 2000, Price obtained a loan of $15,500.00 at Farmer's National Bank in Forney.

Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph sixty-seven of the Verification Affidavit.

68.     The $15,500.00 from Price's loan at Farmer's National Bank in Forney was used for the purchase of a 1997 Jaguar XK priced at $39,500.00.

Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph sixty-eight of the Verification Affidavit.

69.     Fain traded a 1996 Jaguar XK valued at $25,000.00 for the remaining balance owed on the 1997 Jaguar XK for which Price obtained the loan at Farmer's National Bank in Forney on or about January 20, 2000.

Response:       FAIN recalls this, but is unsure of the dates in the allegations in paragraph sixty-nine of the Verification Affidavit.

70.     The 1997 Jaguar XK for which Price obtained the loan at Farmer's National Bank in Forney on or about January 20, 2000 was titled in the name of Dapheny Fain.

Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph seventy of the Verification Affidavit.

71.     On or about July 28, 2000, a Form 1 Individual Estate Property Record and Report was

generated for John Wiley Price III in his Chapter 7 proceeding.

    a.     This form reflected the same assets as had been reported on or about May 17,

    1996 which included only $1,400.00 in cash deposits in bank accounts.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph

seventy-one and seventy-one (a) of the Verification Affidavit.

72.     On or about September 22, 2000, Price obtained a mortgage loan of $112,000.00 on his

residence at 406 E. Fifth Avenue.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph

seventy-two of the Verification Affidavit.

73.     On or about September 25, 2000, Price signed a signature card at Farmer's National Bank

in Forney to open a checking account ending in 8671.

    a.     On or about September 25, 2000, Fain also signed a signature card at Farmer's

    National Bank in Forney to open a checking account ending in 8671.

    b.     This account was opened for Kwanzaa Fest, Incorporated.

    c.     Kwanzaa Fest, Inc. is supposed to be a 501c3 non-profit entity.

    d.     The account was opened with an initial deposit of $22,954.15.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph

seventy-three of the Verification Affidavit; Fain admits the allegations in seventy-three

(a) but lacks sufficient knowledge of the date alleged; Fain admits the allegations in

seventy-three (b); Fain admits the allegation in seventy-three (c) to the extent that

Kwanzaa Fest is a 501(c)(3) non-profit entity and denies the allegation to the extent that

it contains an inference that Kwanzaa Fest was not treated as a 501(c)(3) entity.

74.     On or about September 25, 2000, Price obtained title in the residence at 1604 Sylvan
Avenue with Ora Lee Watson.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph
seventy-four of the Verification Affidavit.

75.     On or about December 29, 2000, the Dallas County website records reflect that Price paid
the property taxes on 7001 Grady Niblo Road for the year 1999.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph
seventy-five of the Verification Affidavit.

76.     On or about December 29, 2000, the Dallas County website records reflect that Price paid
the property taxes on 7001 Grady Niblo Road for the year 2000.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph
seventy-six of the Verification Affidavit.

77.     On or about March 2, 2001, Price traded a 1995 Dodge Viper valued at $41,000.00 to
purchase a 1998 Dodge Viper priced at $47,000.00.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph
seventy-seven of the Verification Affidavit.

78.     Price financed the balance of the March 2, 2001 Dodge Viper trade with a loan at City
Bank Forney (formerly Farmer's National).

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph
seventy-eight of the Verification Affidavit.

79.     On or about May 11, 2001, the Chapter 7 bankruptcy proceeding of Price was terminated.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph
seventy-nine of the Verification Affidavit.

80.     Price discharged approximately $372,000.00 of debt through the bankruptcy proceedings.

        Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph

eighty of the Verification Affidavit.

81.     On or about May 23, 2001, Price opened Dallas Telco checking account ending in 1862.

        a.  This account was opened with a deposit of $64,825.59.

        Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph

eighty-one and eighty-one (a) of the Verification Affidavit.

82.     Fain was authorized on the Dallas Telco checking account ending in 1862 to:

        a.  cash checks or

        b.  to deposit checks with cash back.

        Response:       FAIN admits the allegations in paragraph eighty-two (a) and (b) of

the Verification Affidavit.

83.     In October of 2001 Price caused Fain to go to Dallas Telco.

        Response:       FAIN lacks sufficient knowledge as to the allegations in paragraph

eighty-three of the Verification Affidavit.

84.     In October of 2001 Fain conducted a transaction with the Dallas Telco checking account

ending in 1862.

        a.  The transaction was conducted with a check from KLNA payable to Price in the

        amount of $1,500.00 with the notation "Loan" on the memo line.

        Response:       As to the allegations in paragraph eighty-four of the Verification

Affidavit, FAIN recalls going to the bank and taking the check from KNL, but Fain

needed cash so she put the comment "loan" so she would know to pay it back to Price.

85.     On or about June 8, 2001, Fain opened Dallas Telco checking account ending in 3476.

Response:        FAIN admits the allegation in paragraph eighty-five of the

Verification Affidavit that she opened a Dallas Telco checking account but lacks

sufficient knowledge as to the alleged date the account was opened or the account

number.

86.    When Fain opened the Dallas Telco checking account ending in 3476:

    a.   she named Price as her employer and

    b.   she named Caryn Fain as her beneficiary.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph

eighty-six of the Verification Affidavit; specifically, Fain lacks sufficient knowledge as

to whether she named Price as her employer or Caryn Fain as her beneficiary.

87.    On or about July 26, 2001, Price had 5 Certificates of Deposit held by City Bank of

Forney.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph

eighty-seven of the Verification Affidavit.

88.    On or about July 26, 2001, Price used the 5 Certificates of Deposit held by City Bank of

Forney date as collateral for a line of credit to obtain a USAA credit card with a

$10,000.00 limit.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph

eighty-eight of the Verification Affidavit.

89.    On or about September 3, 2002, Price purchased from Wayne White the interest in

approximately 9 acres known as 7001 Grady Niblo held in the name of Wayne White.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph

eighty-nine of the Verification Affidavit.

90.     Price obtained a loan of $150,000.00 from City Bank in Forney (formerly Farmer's National) for his September 3, 2002 purchase of the interest in 7001 Grady Niblo.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph ninety of the Verification Affidavit.

91.     Wayne White was the only seller listed on the Department of Housing and Urban Development Settlement Statement or "HUD-1" for Price's September 3, 2002 purchase of the interest in 7001 Grady Niblo.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph ninety-one of the Verification Affidavit.

92.     However, the HUD-1 Settlement Statement for Price's September 3, 2002 purchase of 7001 Grady Niblo reflected a partnership adjustment (increase) of $25,303.71 to the purchase price of $125,000.00.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph ninety-two of the Verification Affidavit.

93.     Price was present at Ranger Title during the closing of the September 3, 2002 purchase of the property interest in 7001 Grady Niblo from White.

    <u>Response</u>:     FAIN lacks sufficient knowledge as to the allegations in paragraph ninety-three of the Verification Affidavit.

94.     Fain was present at Ranger Title during the closing of the September 3, 2002 purchase of the property interest in 7001 Grady Niblo from White.

    <u>Response</u>:     FAIN believes she was.

95.     Price requested a title insurance policy in his name for his September 3, 2002 purchase of 7001 Grady Niblo.

> Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph ninety-five of the Verification Affidavit.

96.   Ranger Title was requested to make the partnership adjustment on the HUD-1 with no knowledge of the underlying partnership agreement when Price purchased 7001 Grady Niblo on or about September 3, 2002.

> Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph ninety-six of the Verification Affidavit.

97.   Based on the foregoing facts, Affiant believes the partnership adjustment for Price's September 3, 2002 purchase of 7001 Grady Niblo from White was necessary to compensate White for the 50% of debt and fees that otherwise would have been charged to the proceeds of Fain.

> Response:      FAIN lacks understanding of this allegation as written in paragraph ninety-seven of the Verification Affidavit.

98.   The HUD-1 reflected net proceeds to White of $96,505.38 after payoff of the mortgage note at Lakeside National Bank in the amount of $42,643.89.

> Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph ninety-eight of the Verification Affidavit.

99.   At the closing Ranger Title was informed of a prior partnership agreement for the property, and Ranger Title prepared a Quit Claim Deed for Fain in order to ensure that the new title would be securely recorded in the name of Price.

> Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph ninety-nine of the Verification Affidavit.

100.    On or about September 3, 2002, Fain executed the Quit Claim Deed to Price for her

previously undisclosed interest in 7001 Grady Niblo.

Response:      As to the allegations in paragraph one hundred of the Verification

Affidavit, FAIN admits as to the Quit Claim Deed, but not to the words "undisclosed

interest."

101.    On or about January 3, 2003, Price made a down payment of $35,000.00 to assist Fain in

the purchase of the residence at 625 Missionary Ridge in DeSoto, Texas.

Response:      As to the allegations in paragraph one-hundred-one of the

Verification Affidavit, FAIN does not agree with the word "assist." This statement

alludes to Price giving Fain funds for a down payment, when the down payment came

from the sale of Fain's previous home at 3319 Rockbluff in Dallas. Fain does not recall

the timeframe of when the funds were received and when the down payment was made,

although Fain asked Price to help her with the process of the new home.

102.    The purchase price of 625 Missionary Ridge in DeSoto, Texas was $168,626.74.

Response:      FAIN admits the allegations in paragraph one-hundred-two of the

Verification Affidavit.

103.    Fain obtained a mortgage loan for 625 Missionary Ridge in DeSoto, Texas to finance

what remained of the $168,626.74 purchase price.

Response:      FAIN lacks sufficient knowledge as to the specific monetary

amount in paragraph one-hundred-three of the Verification Affidavit, but believes it is

correct.

104.    On or about May 15, 2003, Price obtained a $52,000.00 loan at Dallas Telco using his

1998 Dodge Viper as collateral.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-four of the Verification Affidavit.

105.    Price used part of the May 15, 2003 loan of $52,000.00 from Dallas Telco to pay off his loan ending in 1427 for the 1998 Viper at City Bank (formerly Farmer's National) in the amount of $16,369.69.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-five of the Verification Affidavit.

106.    Price used part of the May 15, 2003 loan of $52,000.00 from Dallas Telco to pay off his loan ending in 1025 for the 1997 Jaguar at City Bank (formerly Farmer's National) in the amount of  $12,681.65.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-six of the Verification Affidavit.

107.    Price deposited the remaining balance of $22,904.21 from his May 15, 2003 loan of $52,000 from Dallas Telco into his Dallas Telco checking account ending in 1862.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seven of the Verification Affidavit.

108.    On or about May 27, 2003, Price opened Lakeside National Bank checking account ending in 1984.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eight of the Verification Affidavit.

109.    Price opened the Lakeside National Bank checking account ending in 1984 with the deposit of a City Bank (formerly Farmer's National) cashier's check in the amount of $33,901.65.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-nine of the Verification Affidavit.

110.   The $33,901.65 City Bank cashier's check that Price used to open the Lakeside National Bank checking account ending in 1984 was derived from the sale of Certificates of Deposit.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ten of the Verification Affidavit.

111.   On or about May 27, 2003, Price opened Lakeside National Bank savings account ending in 2985.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eleven of the Verification Affidavit.

112.   Price opened the Lakeside National Bank savings account ending in 2985 with a deposit of $6,363.27.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-twelve of the Verification Affidavit.

113.   The $6,363.27 used to open the Lakeside National Bank savings account   ending in 2985 was derived from closing out City Bank (formerly Farmer's National) savings account ending in 7407.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirteen of the Verification Affidavit.

114.   On or about June 2, 2003, Price opened the Lakeside National Bank money market account ending in 2034.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fourteen of the Verification Affidavit.

115.    Price opened the Lakeside National Bank money market account ending in 2034 with a cashier's check from City Bank (formerly Farmer's National) in the amount of $19,987.33.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fifteen of the Verification Affidavit.

116.    The $19,987.33 City Bank cashier's check used to open the Lakeside National Bank money market account ending in 2034 was derived from Price's sale of Certificates of Deposit.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixteen of the Verification Affidavit.

117.    On or about June 2, 2003, Price opened the Lakeside National Bank money market account ending in 2042.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seventeen of the Verification Affidavit.

118.    Price opened the Lakeside National Bank money market account ending in 2042 with a cashier's check from City Bank (formerly Farmer's National) in the amount of $26,584.83.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighteen of the Verification Affidavit.

119.    The $26,584.83 City Bank cashier's check used to open the Lakeside National Bank

money market account ending in 2042 was derived from Price's sale of Certificates of

Deposit.

    Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph

one-hundred-nineteen of the Verification Affidavit.

120.    On or about July 18, 2003, Price obtained a loan of $150,000.00 from Lakeside National

Bank.

    Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph

one-hundred-twenty of the Verification Affidavit.

121.    Price used the $150,000.00 from Lakeside National Bank to pay off the loan originated in

2002 at City Bank for the purchase of the interest in property known as 7001 Grady Niblo

Road.

    Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph

one-hundred-twenty-one of the Verification Affidavit.

122.    When he obtained the $150,000.00 from Lakeside National Bank on or about July 18,

2003, Price valued the property known as 7001 Grady Niblo Road at $330,000.00.

    Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph

one-hundred- twenty-two of the Verification Affidavit.

123.    To obtain the $150,000.00 loan from Lakeside National Bank, Price filed personal

financial statements with Lakeside National Bank on or about July 18, 2003, reflecting

that as of March 31, 2003 Price had:

    a.   assets of $875,500.00,

    b.   a net worth of $672,500.00,

c.  cash in banks in the amount of $103,500.00,

d.  a 50% ownership interest in the property previously identified at 635 and I-30 with a known address of 16800 LBJ Freeway in Dallas, and

e.  a 50% ownership interest in the property previously identified as a "certain identified Trinity property" that is known to have the address of 7424 Fairport Road in Dallas.

> Response:   FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-twenty-three of the Verification Affidavit.

124.  The properties at 16800 LBJ Freeway in Dallas and 7424 Fairport Road in Dallas were still in the name of White when Price filed his personal financial statements with Lakeside National bank for the $150,000.00 loan.

> Response:   FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-twenty-four of the Verification Affidavit.

125.  The submission of the financial statement of March 31, 2003 reflecting the ownership by Price of two properties still in the name of White (in contract with Fain) further confirms that Fain's interest in properties with White was only a nominee interest for Price.

> Response:   FAIN denies the allegations in paragraph one-hundred-twenty-five of the Verification Affidavit.

126.  On or about February 18, 2005, White sold the 7424 Fairport Road property to a third party buyer for $45,000.00 with the balance of the debt at $8,462.21.

> Response:   The allegations in paragraph one-hundred-twenty-six of the Verification Affidavit allude that White sold it alone, when FAIN also had an interest in the property.

127.   Fain was not named on the HUD-1 Settlement Statement for the February 18, 2005 sale

of the 7424 Fairport Road property.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph

one-hundred-twenty-seven of the Verification Affidavit.

128.   However, Fain executed a Quit Claim Deed to the Buyer for the February 18, 2005 sale

of the 7424 Fairport Road property which was not recorded.

      Response:      FAIN lacks sufficient knowledge as to the recording allegations in

paragraph one-hundred-twenty-eight of the Verification Affidavit, but admits executing a

Quit Claim deed.

129.   Proceeds of the February 18, 2005 sale of the 7424 Fairport Road property were divided

50% each to the Whites and Fain on a separate document which Fain signed.

      Response:      As to the allegations in paragraph one-hundred-twenty-nine of the

Verification Affidavit, FAIN is unsure if she signed a separate document, but admits to

the 50% that was divided each to White and Fain.

130.   Fain received a net payment of $17,495.92 from Title Texas for the February 18, 2005

sale of the 7424 Fairport Road property.

      Response:      FAIN admits the allegations in paragraph one-hundred-thirty of the

Verification Affidavit.

131.   On or about February 22, 2005, Price deposited a Title Texas check payable to Fain in the

amount of $17,495.92 into his Lakewood National Bank savings account ending in 2985.

      Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph

one-hundred-thirty-one of the Verification Affidavit.

132.   On or about September 14, 2006, Price sold his 1998 Dodge Viper to Danny Faulkner.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-two of the Verification Affidavit.

133.   Danny Faulkner is the son of D.L. Faulkner.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-three of the Verification Affidavit.

134.   The declared price for the sale of the 1998 Dodge Viper between Price and Danny Faulkner was $30,000.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-four of the Verification Affidavit.

135.   However, the cashier's check Price received from Faulkner was actually $38,000.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-five of the Verification Affidavit.

136.   Price deposited the $38,000.00 cashier's check from Danny Faulkner into the Lakeside National Bank account ending in 2985.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-six of the Verification Affidavit.

137.   In or about December 2011 Price negotiated the sale of 7001 Grady Niblo to W.O. Henry at the purchase price of $750,000.00, pending HUD approval of the land cost for the proposed project.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-seven of the Verification Affidavit.

138.   Henry had previously advanced a payment of $50,000.00 to Price plus certain expenses for the 7001 Grady Niblo property.

      Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-eight of the Verification Affidavit.

139.    On December 15, 2011, Henry paid off all notes and fees necessary to transfer the 7001 Grady Niblo property to his control in a closing at Republic Title.

      Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-thirty-nine of the Verification Affidavit.

140.    The negotiated contract between Price and Henry for the 7001 Grady Niblo property called for an immediate payment of $50,000.00 and other monies to be paid to Price upon certain milestones in the development.

      Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty of the Verification Affidavit.

141.    On December 19, 2011, FBI agents seized the $50,000.00 payment from Henry to Price pursuant to a Federal Seizure Warrant.

      Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-one of the Verification Affidavit.

142.    In or about January 2012 HUD approved the 7001 Grady Niblo land cost for Henry at $750,000.00.

      Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-two of the Verification Affidavit.

143.    After HUD approved the 7001 Grady Niblo land cost at $750,000.00, Henry was able to calculate the final amount due to Price after netting out other expenses and advances as agreed.  The final balance due to Price, to be paid in installments of $25,000.00 per month, was $180,763.47.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-three of the Verification Affidavit.

144.    In or about February 2012 Henry and Price reduced to writing their agreement that Henry owed a final balance to Price of $180,763.47 which was to be paid to Price in installments of $25,000.00 per month.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-four of the Verification Affidavit.

145.    In or about March 2012 Republic Title learned of the other monies that were negotiated outside of the closing in December when a media outlet reported the FBI seizure of the $50,000.00 while showing an image of a notification letter which the FBI had sent only to Price and his attorney William Ravkind.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-five of the Verification Affidavit.

146.    When Republic Title learned of the monies that Price and Henry had negotiated outside of their closing on the 7001 Grady Niblo property, the title company advised Henry that the unpaid purchase monies in effect gave Price a vendor's lien on the property and that Republic Title would be unable to issue title insurance for HUD.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-six of the Verification Affidavit.

147.    Republic Title ordered Henry to do a revised closing on the 7001 Grady Niblo property with a requirement for all purchase monies to be wired to Republic Title prior to the closing.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-seven of the Verification Affidavit.

148.   As part of the revised closing on the 7001 Grady Niblo property, Price was required to execute a release of lien to Republic Title.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-eight of the Verification Affidavit.

149.   On March 18, 2012, the FBI obtained a seizure warrant for all proceeds due to John Wiley Price from the sale of the 7001 Grady Niblo property.

   a.   The prior $50,000.00 remained seized and FBI agents served the seizure warrant on Republic Title on March 18, 2012.

   b.   Additional funds of $180,763.47 were seized on March 23, 2012.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-forty-nine (a) and (b) of the Verification Affidavit.

150.   Affiant believes the above facts support a reason to believe that Price, Fain, and others knowingly and fraudulently conspired to conceal property that should have been included in Price's bankruptcy estate, and that in a series of financial transactions they intended to convert and launder the proceeds of that unlawful activity into titled property interests and/or the funds which have been seized from the sales of those interests.

Response:      FAIN lacks sufficient knowledge as to what the Affiant does or does not believe, but denies the conclusion stated in paragraph one-hundred-fifty the Verification Affidavit.

## <u>Conspiracy to violate 18 U.S.C. § 666</u>

151.   Dallas County is a local government entity that is a political subdivision of the State of

Texas as defined by the statute.

    <u>Response</u>:     FAIN admits the allegations in paragraph one-hundred-fifty-one of

the Verification Affidavit.

152.   Price has been an elected member of the Dallas County Commissioners Court, the

governing body of Dallas County, since in or about January 1985.

    <u>Response</u>:     FAIN admits the allegations in paragraph one-hundred-fifty-two of

the Verification Affidavit.

153.   Price is thus an agent of the local government as defined by the statute.

    <u>Response</u>:     FAIN admits the allegations in paragraph one-hundred-fifty-three

of the Verification Affidavit.

154.   Dallas County has received at least $10,000.00 in federal funds under a federal program

involving a grant, contract, subsidy, loan, guarantee, insurance or other form of federal

assistance for each of the years 2001 through 2011.

    <u>Response</u>:     FAIN admits the allegations in paragraph one-hundred-fifty-four

of the Verification Affidavit.

155.   Since filing her assumed name record for KLNA on or about March 6, 1998, Nealy has

acted through KLNA as a consultant and lobbyist for clients with matters that came under

the jurisdiction of local and state governments including Dallas County and the City of

Dallas.  Those matters included legislative and contractual issues.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fifty-five of the Verification Affidavit.

156.   From in or about 2001 through 2011 KLNA received payments in excess of $2,000,000.00 from clients with legislative or contractual matters under the jurisdiction or influence of the Dallas County Commissioners including:

a.   American Airlines,

b.   Atos Origin,

c.   Bearing Point,

d.   Hillwood,

e.   Provident Realty,

f.   Q-Net,

g.   Schlumberger,

h.   Unisys,

i.   CMGRP / Weber-Shandwick (for Wal-Mart and others),

j.   and others.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fifty-six of the Verification Affidavit.

157.   From in or about 2001 through 2011, KLNA received over $500,000.00 in additional payments from other consultants and campaign accounts for various political campaigns.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fifty-seven of the Verification Affidavit.

158.   Since in or about 2002 through 2011, Nealy has owned three different Chevrolet Avalanche trucks in succession.

<u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fifty-eight of the Verification Affidavit.

159.   For the majority of the time in the following years, Price has had the use of a Chevrolet Avalanche truck owned by Nealy:

    a.   2002

    b.   2003

    c.   2004

    d.   2005

    e.   2006

    f.   2007

    g.   2008

    h.   2009

    i.   2010

    j.   2011

    <u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fifty-nine of the Verification Affidavit.

160.   The value of Price's use of Nealy's Chevrolet Avalanche truck for the majority of the time within each year from 2002 through 2011 is $5,000.00 or more each year.

    <u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty of the Verification Affidavit.

161.   Since in or about 2004 through 2011, Nealy has owned a 2005 BMW 645 convertible automobile.

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-fifty-sixty-one of the Verification Affidavit.

162. For the majority of the time for the following years, Price has had the use of the 2005 BMW 645 convertible automobile owned by Nealy:

    a. 2004

    b. 2005

    c. 2006

    d. 2007

    e. 2008

    f. 2009

    g. 2010

    h. 2011

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-two of the Verification Affidavit.

163. The value of Price's use of Nealy's 2005 BMW 645 convertible automobile for the majority of the time within each year from 2004 through 2011 is $5,000.00 or more each year.

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-three of the Verification Affidavit.

164. Since at least in or about 2001 through 2011, Nealy has provided the payment of monies to Price in various forms totaling in excess of $500,000.00.

Response: FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-four of the Verification Affidavit.

165.    Of the payments from Nealy to Price, some purport to be funding or reimbursement of expenses paid by Price in connection with the renovation or repair of real properties held in the name of Nealy.

      <u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-five of the Verification Affidavit.

166.    However, Price has received the majority of the income from the real properties for which Nealy purports to reimburse Price for renovation or repair expenses.

      <u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-six of the Verification Affidavit.

167.    Of the payments from Nealy to Price, almost half of the payments were made to Price by in or about 2005.

      <u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-seven of the Verification Affidavit.

168.    Of the payments from Nealy to Price, over $60,000.00 was from payments to or from third parties that were diverted to Price.

      <u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-eight of the Verification Affidavit.

169.    Of the payments from Nealy to Price, over $80,000.00 was from payments Nealy made as checks payable to Dallas Telco.

      <u>Response</u>:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-sixty-nine of the Verification Affidavit.

170.    Of the payments from Nealy to Price, $13,000.00 was from payments Nealy made as checks payable to Kathy Nealy and gave to Price.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seventy of the Verification Affidavit.

171.   Of the payments from Nealy to Price, over $55,000.00 was from payments made to Price by the tenant of a building titled in the name of Nealy.

   a.   Most of these payments were converted to cash between, in, or about April 2007 and May 2011.

   Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seventy-one (a) of the Verification Affidavit.

172.   Kwanzaa Fest, Inc. is organized as a 501c3 non-profit entity.

   Response:      FAIN admits the allegations in paragraph one-hundred-seventy-two of the Verification Affidavit.

173.   Price and Fain control Kwanzaa Fest as an entity.

   Response:      As to the allegations in paragraph one-hundred-seventy-three of the Verification Affidavit, FAIN admits if the word "control" means both have to sign checks; but the committee made decisions in committee meetings.

174.   Since at least in or about 2003 Nealy has acted as the Festival Consultant to Kwanzaa Fest.

   Response:      FAIN admits the allegations in paragraph one-hundred-seventy-four of the Verification Affidavit.

175.   The Kwanzaa Fest sponsor report for December 2003 reflects KLNA clients American Airlines, Schlumberger, Wal-Mart, Hillwood, and Provident Realty among others who contributed to the event.

Response:      FAIN admits the allegations in paragraph one-hundred-seventy-five of the Verification Affidavit.

**Relevant Selected Transactions Between Nealy and Price**

176.   On or about January 2, 2002, Price withdrew $9,600.00 from a bank account of KLNA at City Bank in Forney and:

    a.   deposited $3,000.00 to Price's savings account at City Bank in Forney,

    b.   obtained 2 cashier's checks of $2,500.00 each for Price's benefit, and

    c.   obtained $1,600.00 in cash.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seventy-six of the Verification Affidavit.

177.   On or about January 15, 2002, Price deposited a Hillwood entity check payable to KLNA in the amount of $23,169.55 to a bank account of KLNA at City Bank in Forney.

    a.   As part of this transaction, Price withdrew $2,500.00 in cash and

    b.   Price then deposited that $2,500.00 into his account at City Bank in Forney ending in 6372.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seventy-seven of the Verification Affidavit.

178.   On or about February 5, 2002, on a motion by Price, the Dallas County Commissioners Court (DCCC) adopted court order 2002-264 which rejected the recommendation of the Evaluation Committee and selected 4 companies including Schlumberger to proceed as finalists in the next phase of the Request for Proposal (RFP).

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seventy-eight of the Verification Affidavit.

179.   On or about February 5, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $7,500.00 into her City Bank account ending in 8994.

   a.   As part of this bank visit, Nealy withdrew $2,500.00 cash from the same account.

   Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-seventy-nine of the Verification Affidavit.

180.   On or about April 26, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $12,500.00 into her Bank of America account ending in 1364.

   Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty of the Verification Affidavit.

181.   On or about April 30, 2002, on a motion by Price, the DCCC adopted court order 2002-800 which authorized Dallas County staff and consultants to proceed with Schlumberger to develop an agreement for contract.

   Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty-one of the Verification Affidavit.

182.   On or about May 20, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $13,073.61 into her Bank of America account ending in 1364.

   Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty-two of the Verification Affidavit.

183.   On or about May 21, 2002, on a motion by Price, the DCCC adopted court order 2002-947 which authorized the selection of Schlumberger as the new information technology ("IT") service provider for Dallas County.

   Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty-three of the Verification Affidavit.

184.	On or about May 21, 2002, Nealy withdrew $5,500.00 from her KLNA account at City Bank in Forney.

    a.	As part of this transaction, Nealy deposited $2,500.00 to Price's account at City Bank in Forney ending in 6372, and

    b.	Nealy obtained $3,000.00 in cash.

    <u>Response</u>:	FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty-four of the Verification Affidavit.

185.	On or about June 10, 2002, Nealy deposited a Schlumberger check payable to KLNA in the amount of $25,000.00 to her City Bank account ending in 8994 and took cash back of $2,500.00.

    <u>Response</u>:	FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty-five of the Verification Affidavit.

186.	Nealy received other payments from Schlumberger for an approximate total of $251,000.00.

    <u>Response</u>:	FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty-six of the Verification Affidavit.

187.	On or about July 24, 2002, one day before his purchase of 7001 Grady Niblo from Wayne White, Price received a transfer of $6,000.00 from a KLNA account at City Bank in Forney to his account there ending in 6372.

    <u>Response</u>:	FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-eighty-seven of the Verification Affidavit.

188.   On or about August 19, 2002, Nealy deposited a check from Urban Related Development
– Victory, payable to KLNA in the amount of $6,924.81 into Price's City Bank in Forney
account ending in 6372.

   a.   As part of this transaction, Nealy took back cash of $2,424.81 which she
   deposited into a KLNA account.

   Response:   FAIN lacks sufficient knowledge as to the allegations in paragraph
one-hundred-eighty-eight of the Verification Affidavit.

189.   On or about September 11, 2002, Nealy split the deposit of a Wal-Mart check payable to
KLNA in the amount of $12,000.00 and:

   a.   put $3,000.00 of the money into the City Bank in Forney account of Price ending
   in 6372,

   b.   took $2,000.00 of cash back, and

   c.   put the balance of this money into a KLNA account.

   Response:   FAIN lacks sufficient knowledge as to the allegations in paragraph
one-hundred-eighty-nine of the Verification Affidavit.

190.   On or about November 20, 2002, Price received a transfer of $15,000.00 from a KLNA
account into his City Bank in Forney account ending in 6372.

   Response:   FAIN lacks sufficient knowledge as to the allegations in paragraph
one-hundred-ninety of the Verification Affidavit.

191.   On or about January 7, 2003, Price deposited to his City Bank in Forney account ending
in 6372 a Nealy/City Bank cashier's check payable to Sheriff Jim Bowles in the amount
of $45,312.02.

   a.   As part of this transaction, Price took cash out of $42,000.00.

ANSWER TO FIRST AMENDED COMPLAINT FOR FORFEITURE *IN REM*
AND RESPONSES TO FIRST AMENDED VERIFICATION AFFIDAVIT - Page 48

     Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-one of the Verification Affidavit.

192.    On June 27, 2011, FBI agents found cash of $40,000.00 wrapped in City Bank cash straps dated on or just before January 7, 2003 in the safe at the residence of Price.

     Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-two of the Verification Affidavit.

193.    On or about May 6, 2003, Nealy obtained a personal loan and cashier's check payable to Sheriff Jim Bowles in the amount of $39,477.25 for the purchase of 2402 S Lancaster Road.

    a.    Nealy made the final payment on this loan on or about July 14, 2008.

     Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-three of the Verification Affidavit.

194.    [REDACTED].

     Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-four of the Verification Affidavit.

195.    Beginning in or about January 2007, the tenant rent payments of approximately $1,200.00 per month for 2402 S. Lancaster were written to Price.

    a.    These rent payments were usually cashed by or for Price at Dallas Telco.

     Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-five of the Verification Affidavit.

196.    On or about December 26, 2003, Nealy deposited a BearingPoint check payable to KLNA in the amount of $2,000.00 into her Bank of America account ending in 1364.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-six of the Verification Affidavit.

197.   On or about April 19, 2004, BearingPoint submitted a proposal to Dallas County for the Recording, Indexing, and Imaging System wherein KLNA was named as a partner with the firm for this project.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-seven of the Verification Affidavit.

198.   On or about May 25, 2004, on a motion by Price, the DCCC adopted court order 2004-934 which authorized staff to proceed with the next phase of an RFP evaluation which included BearingPoint as a designated firm for the Recording, Indexing, and Imaging System for the County Clerk.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-eight of the Verification Affidavit.

199.   On or about June 15, 2004, on a motion by Price, the DCCC adopted court order 2004-1034 which authorized acceptance of the Change of Control Event from Schlumberger to Atos and authorized the County Judge to sign an amendment to the affected IT contract.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph one-hundred-ninety-nine of the Verification Affidavit.

200.   On or about August 2, 2004, Nealy deposited an Atos check payable to KLNA in the amount of $10,000.00 to her Bank of America account ending in 1364.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred of the Verification Affidavit.

201. Atos continued to pay Nealy through in or about March 2007 in an approximate total amount of $234,000.00.

    <u>Response</u>:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-one of the Verification Affidavit.

202. On or about January 25, 2005, with an affirmative signature by Price, the DCCC adopted court order 2005-199 which rendered BearingPoint as the finalist for the Recording, Indexing, and Imaging System, and authorized staff to enter into contract negotiations.

    <u>Response</u>:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-two of the Verification Affidavit.

203. On or about March 29, 2005, with an affirmative signature by Price, the DCCC adopted court order 2005-658 to authorize the execution of a Software License and Professional Services Agreement with BearingPoint for the Recording, Indexing, and Imaging System.

    <u>Response</u>:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-three of the Verification Affidavit.

204. In or about May 2005 Nealy deposited two BearingPoint checks payable to KLNA in total amount of $5,000.00.

    <u>Response</u>:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-four of the Verification Affidavit.

205. In total Nealy received $195,000.00 from BearingPoint through in or about February 2008.

    <u>Response</u>:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-five of the Verification Affidavit.

206.   On or about December 27, 2006, Price deposited into a personal checking account a
check from CMGRP payable to KLNA in the amount of $5,000.00.

a.   As part of this transaction, Price took cash back of $3,000.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-six of the Verification Affidavit.

207.   On or about May 1, 2007, Nealy deposited two checks from Hillwood entities in the total
amount of $2,500.00, and wrote a check for that amount payable to Dallas Telco with the
memo "Furniture" that was deposited into a personal account of Price at Dallas Telco.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-seven of the Verification Affidavit.

208.   On or about May 7, 2007, Nealy deposited a check from a Hillwood entity in the amount
of $2,500.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-eight of the Verification Affidavit.

209.   On or about May 14, 2007, Nealy wrote a KLNA check payable to MMS Company in the
amount of $4,563.44.

a.   Price deposited this check into one of his personal checking accounts.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-nine of the Verification Affidavit.

210.   MMS Company is an assumed name company registered by Fain in 2005.

Response:      FAIN admits the allegations in paragraph two-hundred-ten of the
Verification Affidavit.

211.   MMS had a bank account that had Price on the signature card with Fain.

Response:      FAIN admits the allegations in paragraph two-hundred-eleven of the Verification Affidavit.

212.   On or about May 19, 2007, Price deposited a Nealy check payable to him in the amount of $4,000.00.

    a.   As part of this transaction, Price took cash back of $3,000.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twelve of the Verification Affidavit.

213.   On or about May 24, 2007, Price deposited a KLNA check payable to Lakeside Bank in the amount of $9,700.00 into one of his personal accounts.

    a.   As part of this transaction, Price took cash back of $1,700.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-thirteen of the Verification Affidavit.

214.   On or about November 19, 2007, Nealy deposited a check from Bearing Point payable to KLNA in the amount of $4,000.00.

    a.   Nealy then wrote a check payable to Dallas Telco in the amount of $1,000.00.

    b.   Price deposited that same $1,000 check from Nealy into his personal account at Dallas Telco.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-fourteen of the Verification Affidavit.

215.   On or about July 27, 2010, [REDACTED] requested and obtained a consulting contract for KLNA [REDACTED] that would pay Nealy $7,500.00 per month for six months.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-fifteen of the Verification Affidavit.

216.   On or about August 24, 2010, Price cashed a check from Nealy in the amount of
$1,000.00 with the memo "Lancaster reimburse" along with a check from the tenant at
2402 S. Lancaster in the amount of $460.00.

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-sixteen of the Verification Affidavit.

217.   On or about September 3, 2010, Price received and deposited a check from Nealy in the
amount of $1,000.00 with the memo "Lancaster."

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-seventeen of the Verification Affidavit.

218.   On or about October 25, 2010, Price cashed a check from Nealy in the amount of
$2,700.00 with the memo "BMW repair."

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-eighteen of the Verification Affidavit.

219.   On or about November 15, 2010, Price cashed a check from Nealy in the amount of
$1,700.00 with the memo "BMW-Repair."

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-nineteen of the Verification Affidavit.

220.   [REDACTED].

Response:     FAIN lacks sufficient knowledge as to the allegations in paragraph
two-hundred-twenty of the Verification Affidavit.

221.   On or about January 7, 2011, Nealy deposited a CMGRP (for Wal-Mart) check payable
to KLNA in the amount of $5,000.00, and wrote a check payable to Price in the amount
of $2,100.00 with memo "Lancaster-Repair."

      Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-one of the Verification Affidavit.

222.    On or about March 25, 2011, Price cashed a check from Nealy in the amount of $1,000.00 for "Lancaster-Repair."

      Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-two of the Verification Affidavit.

223.    On or about April 17, 2011, the Dallas Morning News reported that Price had a "Mike Rawlings for Dallas Mayor" sign in the front yard of his home.

      Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-three of the Verification Affidavit.

224.    On or about April 21, 2011 Nealy deposited a $25,000.00 check from the Mike Rawlings Campaign into her "campaign account."

    a.    The next day Nealy wrote a check from that account payable to her name in the amount of $5,000.00 for "consulting."

    b.    This same $5,000 check was deposited by Price to his Dallas Telco account on April 30, 2011 and he took $2,500.00 cash back.

      Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-four of the Verification Affidavit.

225.    On or about May 2, 2011, the Dallas Morning News reported that Price had endorsed Rawlings on May 1, 2011.

      Response:    FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-five of the Verification Affidavit.

226.    On or about May 7, 2011, Price cashed a check from Nealy in the amount of $1,000.00.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-six of the Verification Affidavit.

227.    Affiant believes the foregoing facts support a reason to believe that Price, Nealy, and others corruptly conspired to promote the positions and interests of Price and Nealy, resulting in consulting contracts for Nealy from which Nealy provided a stream of benefits to Price in return for the use of his official position in support of her business and the objectives of her clients.

Response:      FAIN lacks sufficient knowledge as to what the Affiant does or does not believe, but denies the conclusion stated in paragraph two-hundred-twenty-seven of the Verification Affidavit.

### Millennium 2000 Role in the 666 Conspiracy

228.    On or about October 1, 1999, Karen L. Manning opened 2 bank accounts in the name of Millennium 2000 Home Furnishings using the address of her employer in Cedar Hill, Texas.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-eight of the Verification Affidavit.

229.    Beginning in or about October 2000, Millennium 2000 records reflect the ownership and/or sale of African art by Price.

Response:      FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-twenty-nine of the Verification Affidavit.

230.    On or about October 19, 2001, Manning applied for a lease at Southside on Lamar listing Price as a reference.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-thirty of the Verification Affidavit.

231.   Most of the African art on display for sale at Millennium 2000 has been purchased and provided by Price.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-thirty-one of the Verification Affidavit.

232.   Between 2001 and 2011 Price used cash to purchase in excess of $100,000.00 of African art from a Dallas area vendor.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-thirty-two of the Verification Affidavit.

233.   Beginning on or about at least April 27, 2002, Manning and Price began to put on exhibits of African art owned and sold by or for Price.

Response:        As to the allegations in paragraph two-hundred-thirty-three of the Verification Affidavit, FAIN lacks the knowledge of all events, but to her understanding, Price was the host.

234.   Manning would and did generally keep $45.00 for each piece of Price's art sold, and the balance was paid by Manning to Price.

Response:        FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-thirty-four of the Verification Affidavit.

235.   Beginning at least in or about February 2003, the Millennium guest registers showed guests that included persons with business at Dallas County including [REDACTED] and others.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-thirty-five of the Verification Affidavit.

236.    On or about October 1, 2003, [REDACTED] signed a contract with Manning for design and renovation work at her home in the amount of $23,750.00.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-thirty-six of the Verification Affidavit.

237.    In or about October 2005 Price solicited H. Ross Perot to allow Manning to participate in the design work for the W Hotel.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-thirty-seven of the Verification Affidavit.

238.    In or about February 2011 Price solicited an affordable housing developer for whom he had provided official support to allow Manning to install African art in a new development.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-thirty-eight of the Verification Affidavit.

239.    Steve Mize is an employee under Price at Dallas County.

Response:        FAIN admits, except for exact meaning of "under Price", the allegations in paragraph two-hundred-thirty-nine of the Verification Affidavit.

240.    Mize obtained a quote from a contractor working for Dallas County to provide some of the work under the contract between Manning and Sampson.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-forty of the Verification Affidavit.

241.    In or about November 2007 Mize solicited another Dallas County contractor for the installation of glass displays at Millennium.

      <u>Response</u>:    FAIN is unable to answer with certainty the allegations in paragraph two-hundred-forty-one of the Verification Affidavit.

242.    Beginning at least in or about September 30, 2004, Price began to use his campaign funds for the purchase of African art from Millennium to be given as gifts to constituents, campaign donors, and dignitaries.

      <u>Response</u>:    FAIN is unable to answer with certainty the allegations in paragraph two-hundred-forty-two of the Verification Affidavit.

243.    Price benefitted from purchases made with campaign funds when the margin above the $45.00 fee was paid to him and converted to personal use.

      <u>Response</u>:    FAIN is unable to answer with certainty the allegations in paragraph two-hundred-forty-three of the Verification Affidavit. Additionally, the statement is vague and confusing.

244.    A material amount of the campaign funds available for transactions with Millennium were:

    a.    solicited by Nealy and/or

    b.    contributed by persons and entities that had legislative matters and/or contracts with Dallas County.

      <u>Response</u>:    FAIN is unable to answer (a) and (b) with certainty the allegations in paragraph two-hundred-forty-four of the Verification Affidavit.

245.    At least $70,000.00 of Price's campaign funds were used for payments to Millennium.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-forty-five of the Verification Affidavit.

246.    Beginning in or about April 2008 Price began to have his annual Birthday Party fund raiser at the Millennium 2000 gallery.

Response:        As to the allegations in paragraph two-hundred-forty-six of the Verification Affidavit, FAIN is unsure of the dates, but only had two birthday events there in the 16 years Fain has worked for the Commissioner.

247.    Beginning in or about at least 2008 Price began to use Millennium as a site and/or a caterer to host events charged to Dallas County.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-forty-seven of the Verification Affidavit.

248.    Beginning in or about 2009 Price began to use Millennium as a middleman for the sale of goods from MMS Company to Dallas County.

Response:        FAIN denies the allegations in paragraph two-hundred-forty-eight of the Verification Affidavit regarding use of the vague word "middleman."

249.    Between in or about June 2004 and May 2010 Karen Manning and/or Millennium made payments to Price in excess of $100,000.00.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-forty-nine of the Verification Affidavit.

250.    Between on or about January 11, 2005, and at least December 1, 2006, over $60,000.00 of the payments from Manning or Millennium to Price were converted to cash.

Response:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-fifty of the Verification Affidavit.

251.    Affiant believes the foregoing facts support a reason to believe that Price, Manning, and others conspired to use Millennium 2000 as a facility to launder cash and conceal income to Price, including income from monies solicited from persons and companies with business matters at Dallas County.  Millennium 2000 was further used to conceal the conversion to personal use of campaign funds obtained from those and other persons or entities with business matters at Dallas County.

      <u>Response</u>:       FAIN denies that Affiant is making a rational opinion and is using partial and biased facts regarding the allegations in paragraph two-hundred-fifty of the Verification Affidavit.

252.    In total, the payments from Nealy and Manning or Millennium that were converted to cash exceed the amount of cash that was found in the safe at the residence of Price.

      <u>Response</u>:       FAIN lacks sufficient knowledge as to the allegations in paragraph two-hundred-fifty-two of the Verification Affidavit.

### <u>Dapheny Fain and MMS Company (formerly Male Man Sales)</u>

253.    In or about 2002 to 2003 Fain operated an entity named Male Man while also working full-time for Dallas County in the office of Price.

      <u>Response</u>:       FAIN admits the allegations in paragraph two-hundred-fifty-three of the Verification Affidavit.

254.    In or about January of 2005 Price had been in a personal relationship with a manager at Southwestern Bell Communications (SBC) for several years.

      <u>Response</u>:       FAIN is unable to answer with certainty the allegations in paragraph two-hundred-fifty-four of the Verification Affidavit.

255.    When the SBC manager told Price she was looking for a new vendor, Price directed her to Fain as one who could fulfill the need.

    <u>Response</u>:        FAIN is unable to answer with certainty the allegations in paragraph two-hundred-fifty-five of the Verification Affidavit.

256.    Price advised Fain that the manager would call her to discuss it.

    <u>Response</u>:        FAIN denies the allegations in paragraph two-hundred-fifty-six of the Verification Affidavit. Fain does not recall Price telling her someone would call her.

257.    The manager called Fain and they met at a restaurant in the downtown area of Dallas to discuss the opportunity.

    <u>Response</u>:        As to the allegations in paragraph two-hundred-fifty-seven of the Verification Affidavit, this is what FAIN told the agents the day of the raid. Now she is not really sure if it was a restaurant.  She does not recall telling him "downtown" though. Fain told the Agent that [REDACTED] had a serious issue with a black vendor and she needed Fain's help to resolve it. Fain was able to deliver with expediency and with great service, which provided [REDACTED]'s company a great benefit.

258.    On or about January 24, 2005, Fain applied for minority certification for Male Man with the North Texas Regional Certification Agency (NTRCA).

    a.   This application showed 2003 as the last year of active business for Male Man, and

    b.   Manning as a company/client reference, [REDACTED]

    c.   [REDACTED]

Response:       FAIN (a) is unsure, so is unable to answer with certainty; (b) admits as she recalls; (c) admits as she recalls the allegations in paragraph two-hundred-fifty-eight of the Verification Affidavit.

259.   On or about January 31, 2005, Fain opened a bank account at Lakeside National Bank ending in 0007 for Dapheny Fain doing business as Male Man Sales.

   a.   Price was listed as the beneficiary and a convenience signer for this account.

   Response:       As to the allegations in paragraph two-hundred-fifty-nine of the Verification Affidavit, FAIN admits; however, as to (a) she is unsure of the exact language used.

260.   On or about February 8, 2005, Fain solicited a consultant and contractor to Dallas County for a bid on computers and televisions to be sold by Male Man Sales to SBC.

   Response:       FAIN is unsure of what this statement means so she is unable to answer with certainty the allegations in paragraph two-hundred-sixty of the Verification Affidavit.

261.   On or about February 14, 2005, Fain sent a Male Man Sales invoice to SBC in the amount of $121,700.93 for computers and televisions.

   Response:       As to the allegations in paragraph two-hundred-sixty-one of the Verification Affidavit, FAIN knows she sent an invoice, but is not sure if it was for both TVs and computers.

262.   On or about February 22, 2005, Fain received and deposited to the Lakeside National Bank account ending in 0007 a check from SBC in the amount of $121,700.93.

   Response:       FAIN admits the allegations in paragraph two-hundred-sixty-two of the Verification Affidavit.

263.     Between on or about February 22, 2005, and October 1, 2008, SBC/AT&T wrote checks

for Male Man and MMS Company invoices in excess of $1,400,000.00.

> Response:        FAIN has not been able to make certain about the allegations in
>
> paragraph two-hundred-sixty-three of the Verification Affidavit, but believes it is true, so
>
> she admits.

264.     On or about February 22, 2005, Fain also deposited to the Lakeside National Bank

account ending in 0007 the $25,000.00 proceeds of a loan she obtained from Price at

Lakeside National Bank.

> Response:        FAIN admits the allegations in paragraph two-hundred-sixty-four
>
> of the Verification Affidavit, as she believes she obtained this loan from Price.

265.     On or about February 22, 2005, Fain obtained a cashier's check payable to Waterford

Wedgewood USA in the amount of $20,000.00 from the Lakeside National Bank account

ending in 0007.

> Response:        FAIN admits she believes the allegations in paragraph two-
>
> hundred-sixty-five of the Verification Affidavit.

266.     Between February 22, 2005, and June 13, 2011, Price caused over 40 internal or checking

transfers of funds from his personal accounts in excess of $432,970.00 to Male Man Sales

accounts.

> Response:        As to the allegations in paragraph two-hundred-sixty-six of the
>
> Verification Affidavit, FAIN denies Price caused over 40 internal or checking transfers
>
> from his personal account – most were bank loans that Price had taken out to help Fain
>
> out.

267.   Between on or about March 11, 2005, and April 27, 2006, Fain made loan repayments to

Price from the MMS Company account at Lakeside National Bank ending in 0007 of

over $97,000.00.

Response:       As to the allegations in paragraph two-hundred-sixty-seven of the

Verification Affidavit, FAIN is unable to answer with certainty the amount of loan

repayment.

268.   Between on or about February 22, 2005, and December 4, 2008, Price caused 58 of the

checks from SBC or AT&T to be split deposited between his personal accounts in the

amount of $235,215.03 and the MMS Company accounts in the amount of

$1,085,934.48.

Response:       FAIN is unable to answer with certainty the allegations in

paragraph two-hundred-sixty-eight of the Verification Affidavit.

269.   At the times of 9 deposits of the checks from SBC or AT&T from on or about July 27,

2005 to December 4, 2008 Price and Fain caused the taking of cash back in amounts just

under $10,000.00 with each of those separate deposits.

Response:       FAIN is unable to answer with certainty the allegations in

paragraph two-hundred-sixty-nine of the Verification Affidavit, because she cannot swear

to an answer for Price.

270.   In addition to the 9 deposits above, there were a number of lesser such deposits where a

smaller amount of cash was taken back, the total of which is over $30,000.00.

Response:       As to the allegations in paragraph two-hundred-seventy of the

Verification Affidavit, FAIN is unable to answer with certainty the total amount taken

back as cash.

271.    Checks to MMS Company from other customers that were diverted to a personal account

of Price totaled in excess of $45,000.00.

    <u>Response</u>:      FAIN denies because of the word "diverted" in the allegations in

paragraph two-hundred-seventy-one of the Verification Affidavit.

272.    Between in or about March 2005 and June 2011, Fain withdrew cash from MMS

accounts other than from deposits in excess of $40.000.00.

    <u>Response</u>:      FAIN admits the allegations in paragraph two-hundred-seventy-

two of the Verification Affidavit.

### MMS Transaction Showing Price Profit

273.    In or about February 2010 through March 2010, MMS Company bid and sold laundry

equipment to Prairie View A&M University in the amount of $17,768.00.

    <u>Response</u>:      FAIN admits the allegations in paragraph two-hundred-seventy-

three of the Verification Affidavit.

274.    On or about February 23, 2010, Price wrote a Dallas Telco check from his personal

account in the amount of $14,000.00.

    a.   Price then deposited this same check into an MMS account at Dallas Telco.

    b.   Price then used the MMS account at Dallas Telco to obtain a cashier's check in

        approximately the same amount for the purchase of the laundry equipment for

        Prairie View A&M University.

    <u>Response</u>:      As to the allegations in paragraph two-hundred-seventy-four of the

Verification Affidavit, FAIN admits that Fain asked for money to buy the equipment, but

is not sure if it came from Price's personal account. FAIN admits (a) and (b).

275.    On or about April 19, 2010, Price deposited a Prairie View A&M check payable to MMS

Company in the amount of $17,768.00 into his personal account at Dallas Telco.

Response:        As to the allegations in paragraph two-hundred-seventy-five of the

Verification Affidavit, FAIN admits repayment of this loan, plus another loan, but is

unsure of the date.

## Self Dealing Through MMS

276.    From in or about 2005 through 2010, Fain and Price have caused Kwanzaa Fest, Inc. to

make purchases from MMS Company in excess of $120,000.00.

Response:        As to the allegations in paragraph two-hundred-seventy-six of the

Verification Affidavit FAIN disagrees with the term "caused" and is unsure of the

amount.

277.    From in or about 2005 through 2010, clients of KLNA have been solicited by Nealy

resulting in contributions of over $90,000.00 to Kwanzaa Fest.

Response:        FAIN is unable to answer with certainty the allegations in

paragraph two-hundred-seventy-seven of the Verification Affidavit.

278.    From in or about 2006 through 2011, Price used his campaign account funds to make

purchases from MMS Company in excess of $60,000.00.

Response:        As to the allegations in paragraph two-hundred-seventy-eight of

the Verification Affidavit, FAIN disagrees with the phrase "used his campaign account,"

and is unsure of the amount.

279.    From in or about 2006 through 2011, clients of KLNA have been solicited by Nealy

resulting in contributions of over $70,000.00 to the campaign.

Response:        FAIN is unable to answer with certainty the allegations in

paragraph two-hundred-seventy-nine of the Verification Affidavit.

### Interview of Fain

280.    On June 27, 2011, concurrent with the execution of search warrants at the offices of

Price, FBI agents interviewed Fain.

     a.   Fain stated that Price had no role in the business of MMS.

     b.   Fain stated that Price did conduct banking transactions for MMS.

     c.   Fain stated that when Price conducted a bank transaction with cash back for

        MMS, he gave all of it to her and kept none.

     d.   Fain stated that she used the cash taken back from deposits for business expenses

        such as gas, meals, and supplies.

     e.   When asked if agents would find a large amount of cash in a safe at the residence

        of Price, Fain stated that she had a large amount of cash in a safe at his residence.

     f.   Fain stated that she did not have any accounting of the money in the safe.

     g.   Fain stated that she did not know the combination to the safe.

     h.   Fain stated that Price had not transferred any of his money into a bank account of

        MMS.

Response:        As to the allegations in paragraph two-hundred-eighty of the

Verification Affidavit, FAIN says it was not an interview, it was an interrogation, and

answers as follows:  (a) denied as to the use of words "no role" – she does not recall

exact question or words; (b) admitted that he sometimes did and she probably said that;

(c) denied; (d) admitted those were some of her uses; (e) admitted; (f) admitted; (g)

admitted; and (h) denied, as she does not recall the exact language, and informed the

Agent she borrowed money for MMS. Fain says she was so horrified, she is not sure in what order the statements were made.

281.    Affiant believes that the foregoing facts support a reason to believe that Price and Fain have conspired to use Male Man Sales and MMS Company to generate and conceal income for Price.  Moreover, Price and Fain used MMS to convert monies for personal benefit from funds raised by Nealy in the Price campaign and Kwanzaa Fest accounts. The records show that the business started with only $300.00.  Affiant believes that the evidence shows that Price advanced working capital obtained from funds that were corruptly obtained and accumulated.  He advanced the funds through various types of non-cash transfers from his personal accounts, and those amounts along with a reasonable return on investment were paid back largely via banking transactions from the receipts of MMS.  The financial records do not support a theory that Fain and MMS generated enough cash from income above and beyond what was required to pay Price back such that she could and did convert said income to cash sufficient to put "legitimate income" of $114,750.00 into the safe of Price.  To further refute the claim that 50% of the funds in the safe belonged to Fain, there was a lack of any record or segregation within the safe to show such a division.  Fain stated during her interview that she had no accounting of the funds at the time of the search and seizure.  Affiant asserts that such a split is either a random division or an agreed upon split of the corruptly obtained and concealed proceeds of a conspiracy.  In any event, the $229,590.00 in United States currency seized from a safe in the home of Dallas County Commissioner John Wiley Price would not have existed but for the undisclosed and illegal activities described in this affidavit.

<u>Response</u>:        FAIN denies the allegations in paragraph two-hundred-eighty-one

of the Verification Affidavit, as being totally biased and not based on complete and

accurate facts.

### Other Funds Available to Price

282.   Between in or about 2006 and 2011, Price received in excess of $500,000.00 in loans,

gifts, and payments to third parties from a wealthy female friend.

    a.   Approximately 80% of these checks were deposited into bank accounts held by

       Price or to an account for his benefit.

    b.   A payment of $45,000.00 to a third party provided the balance of funds Price

       needed for the purchase of a 2005 Bentley automobile.

    c.   A loan of $100,000.00 in March of 2011, less approximately $25,000.00 used in

       small increments for various expenses, was still in one of Price's bank accounts at

       the time of the FBI search warrants in June 2011.

    d.   Other large sums were believed to have been used for the purchase of expensive

       watches and other gifts.

    e.   Approximately $105,000.00 of the funds was converted to cash at or about the

       time of receipt by Price.

    <u>Response</u>:        FAIN is unable to answer with certainty the allegations in

paragraph two-hundred-eighty-two (a) through (e) of the Verification Affidavit.

### Personal Financial Disclosures

283.   Price is required by state law to file under oath an annual Personal Financial Disclosure

with Dallas County.

      <u>Response</u>:     FAIN admits the allegations in paragraph two-hundred-eighty-three of the Verification Affidavit.

284.    The disclosures are not publicly posted, but are available through a Freedom of Information Application to Dallas County.

      <u>Response</u>:     FAIN admits the allegations in paragraph two-hundred-eighty-four of the Verification Affidavit.

285.    On June 27, 2011, FBI agents executed a search warrant at the offices of the Dallas County Clerk to obtain the original filings of Price.

      <u>Response</u>:     FAIN does not have sufficient information to answer the allegations in paragraph two-hundred-eighty-five of the Verification Affidavit.

286.    The disclosure for 2000 filed on or about April 30, 2001 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

      <u>Response</u>:     FAIN is unsure and therefore, unable to answer with certainty the allegations in paragraph two-hundred-eighty-six of the Verification Affidavit.

287.    The disclosure for 2001 file on or about May 28, 2002 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

      <u>Response</u>:     FAIN is unsure and therefore, unable to answer with certainty the allegations in paragraph two-hundred-eighty-seven of the Verification Affidavit.

288.    The disclosure for 2002 filed on or about April 30, 2003 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

Response:      FAIN is unsure and therefore, unable to answer with certainty the allegations in paragraph two-hundred-eighty-eight of the Verification Affidavit.

289.   The disclosure for 2003 filed on or about February 11, 2004 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.  It did begin to show ownership of the properties acquired with Wayne White as previously concealed by Fain.

Response:      FAIN is unsure and therefore, unable to answer with certainty the allegations in paragraph two-hundred-eighty-nine of the Verification Affidavit.

290.   The disclosure for 2004 filed on or about May 2, 2005 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

Response:      FAIN is unsure and therefore, unable to answer with certainty the allegations in paragraph two-hundred-ninety of the Verification Affidavit.

291.   The disclosure for 2005 filed on or about May 1, 2006 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

Response:      FAIN is unsure and therefore, unable to answer with certainty the allegations in paragraph two-hundred-ninety-one of the Verification Affidavit.

292.   The disclosure for 2006 filed on or about April 30, 2007 did not show receipt or ownership of any of the above described monies through occupational income, gifts, or interest in business entities.

Response:      FAIN is unsure and therefore, unable to answer with certainty the allegations in paragraph two-hundred-ninety-two of the Verification Affidavit.

293.   The disclosure for 2007 filed on or about June 28, 2008 did not show receipt or

ownership of any of the above described monies through occupational income, gifts, or

interest in business entities.

   Response:   FAIN is unsure and therefore, unable to answer with certainty the

allegations in paragraph two-hundred-ninety-three of the Verification Affidavit.

294.   The disclosure for 2008 filed on or about April 30, 2009 did not show receipt or

ownership of any of the above described monies through occupational income, gifts, or

interest in business entities.

   Response:   FAIN is unsure and therefore, unable to answer with certainty the

allegations in paragraph two-hundred-ninety-four of the Verification Affidavit.

295.   No disclosure for 2009 was found in the file or turned over by the Dallas County Clerk

pursuant to a subpoena.

   Response:   FAIN is unable to answer with certainty the allegations in

paragraph two-hundred-ninety-five of the Verification Affidavit.

296.   The disclosure for 2010 filed on or about May 2, 2011 did not show receipt or ownership

of any of the above described monies through occupational income, gifts, or interest in

business entities.

   Response:   FAIN is unsure and therefore, unable to answer with certainty the

allegations in paragraph two-hundred-ninety-six of the Verification Affidavit.

### IRS Financial Investigation

297.   As part of this investigation, the Internal Revenue Service has been analyzing Price's

finances through a means test of his reported net income and expenditures.  Price's prior

bankruptcy has been used as the starting point for the analysis as it establishes a known point in time when Price was required to declare all of his assets and living expenses.

Response:      FAIN is unable to answer with certainty the allegations in paragraph two-hundred-ninety-seven of the Verification Affidavit as to IRS activity.

### Overview of Price's Income and Expenditures

298.   Price's U.S. Individual Income Tax Return for the year 1996 reflects a total available income of $51,323.12 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:      FAIN is unable to answer with certainty the allegations in paragraph two-hundred-ninety-eight of the Verification Affidavit.

299.   For 1996, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition. Considering this amount of expenditures and the total available income for 1996 as stated above, Price's net available income totals negative <$15,684.88>.  This investigation is ongoing and additional expenditures are expected to be identified.

Response:      FAIN is unable to answer with certainty the allegations in paragraph two-hundred-ninety-nine of the Verification Affidavit.

300.   Price's U.S. Individual Income Tax Return for the year 1997 reflects a total available income of $55,009.11 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred of the Verification Affidavit.

301.   For 1997, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition. Considering this amount of expenditures and the total available income for 1997 as stated above, Price's net available income totals negative <$11,998.89>.  This investigation is ongoing and additional expenditures are expected to be identified.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-one of the Verification Affidavit.

302.   Price's U.S. Individual Income Tax Return for the year 1998 reflects a total available income of $62,069.80 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-two of the Verification Affidavit.

303.   For 1998, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition. Considering this amount of expenditures and the total available income for 1998 as stated above, Price's net available income totals negative <$4,938.20>.  This investigation is ongoing and additional expenditures are expected to be identified.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-three of the Verification Affidavit.

304.   Price's U.S. Individual Income Tax Return for the year 1999 reflects a total available income of $66,642.76 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:   FAIN is unable to answer with certainty the allegations in paragraph three-hundred-four of the Verification Affidavit.

305.   For 1999, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition. Considering this amount of expenditures and the total available income for 1999 as stated above, Price's net available income totals negative <$365.24>.  This investigation is ongoing and additional expenditures are expected to be identified.

Response:   FAIN is unable to answer with certainty the allegations in paragraph three-hundred-five of the Verification Affidavit.

306.   Price's U.S. Individual Income Tax Return for the year 2000 reflects a total available income of $38,997.56 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:   FAIN is unable to answer with certainty the allegations in paragraph three-hundred-six of the Verification Affidavit.

307.   For 2000, Price's yearly expenditures were calculated as being $67,008.00 based solely on monthly expenditures reported by Price on Schedule J of his 1996 bankruptcy petition. Considering this amount of expenditures and the total available income for 2000 as stated

above, Price's net available income totals negative <$28,010.44>.  This investigation is ongoing and additional expenditures are expected to be identified.

    Response:    FAIN is unable to answer with certainty the allegations in paragraph three-hundred-seven of the Verification Affidavit.

308.    Additionally, during the time period of 1996 through 2000, Price purchased seven Certificates of Deposit (CD) valued at more than $80,000.00.  Loan documents obtained during the investigation reveal the CDs were obtained sometime after 1996 and were utilized by Price as collateral on other loan applications as late as May 1, 2002.

    Response:    FAIN is unable to answer with certainty the allegations in paragraph three-hundred-eight of the Verification Affidavit.

309.    Price's U.S. Individual Income Tax Return for the year 2001 reflects a total available income of $52,250.55 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

    Response:    FAIN is unable to answer with certainty the allegations in paragraph three-hundred-nine of the Verification Affidavit.

310.    For 2001, expenditures were identified through financial records relating to loan payments in the amount of $35,963.89.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $18,262.13.  Considering these amounts of expenditures and the total available income for 2001 as stated above, Price's net available income totals negative <$1,975.47>.  This investigation is ongoing and additional expenditures are expected to be identified.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-ten of the Verification Affidavit.

311.    Price's U.S. Individual Income Tax Return for the year 2002 reflects a total available income of $52,243.28 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-eleven of the Verification Affidavit.

312.    For 2002, expenditures were identified through financial records relating to loan payments in the amount of $40,697.99.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $2,963.64. Considering these amounts of expenditures and the total available income for 2002 as stated above, Price's net available income totals $8,581.65.[1]  This investigation is ongoing and additional expenditures are expected to be identified.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twelve of the Verification Affidavit.

313.    Price's U.S. Individual Income Tax Return for the year 2003 reflects a total available income of $57,473.36 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-thirteen of the Verification Affidavit.

---

[1] This number and three others were mistakenly transcribed in the prior sealed affidavit as negative numbers which are now being corrected prior to unsealing.

314.   For 2003, expenditures were identified through financial records relating to loan payments in the amount of $33,904.95.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $10,833.40. Considering these amounts of expenditures and the total available income for 2003 as stated above, Price's net available income totals $12,735.01.  This investigation is ongoing and additional expenditures are expected to be identified.

   Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-fourteen of the Verification Affidavit.

315.   Price's U.S. Individual Income Tax Return for the year 2004 reflects a total available income of $33,131.23 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

   Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-fifteen of the Verification Affidavit.

316.   For 2004, expenditures were identified through financial records relating to loan payments in the amount of $4,250.20.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $13,759.94. Considering these amounts of expenditures and the total available income for 2004 as stated above, Price's net available income totals $15,121.09.  This investigation is ongoing and additional expenditures are expected to be identified.

   Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-sixteen of the Verification Affidavit.

317.     Price's U.S. Individual Income Tax Return for the year 2005 reflects a total available

income of $63,316.85 after considering payroll expenses and all deductions claimed on

schedules included with the tax return, as well as any income tax refunds he may have

received during the year.

Response:     FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-seventeen of the Verification Affidavit.

318.     For 2005, expenditures were identified through financial records relating to loan

payments in the amount of $14,381.02.  Other expenditures relating to items such as

telephone, utilities, and insurance were identified and computed to be $10,794.46.

Considering these amounts of expenditures and the total available income for 2005 as

stated above, Price's net available income totals $38,141.37.  This investigation is

ongoing and additional expenditures are expected to be identified.

Response:     FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-eighteen of the Verification Affidavit.

319.     Price's U.S. Individual Income Tax Return for the year 2006 reflects a total available

income of $38,383.29 after considering payroll expenses and all deductions claimed on

schedules included with the tax return, as well as any income tax refunds he may have

received during the year.

Response:     FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-nineteen of the Verification Affidavit.

320.     For 2006, expenditures were identified through financial records relating to loan

payments in the amount of $41,655.75.  Other expenditures relating to items such as

telephone, utilities, and insurance were identified and computed to be $1,600.06.

Considering these amounts of expenditures and the total available income for 2006 as stated above, Price's net available income totals negative <$4,872.52>.  This investigation is ongoing and additional expenditures are expected to be identified.

      <u>Response</u>:     FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty of the Verification Affidavit.

321.    Price's U.S. Individual Income Tax Return for the year 2007 reflects a total available income of $50,186.34 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

      <u>Response</u>:     FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-one of the Verification Affidavit.

322.    For 2007, expenditures were identified through financial records relating to loan payments in the amount of $85,593.78.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $9,396.33.  Considering these amounts of expenditures and the total available income for 2001 as stated above, Price's net available income totals negative <$44,803.77>.  This investigation is ongoing and additional expenditures are expected to be identified.

      <u>Response</u>:     FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-two of the Verification Affidavit.

323.    Price's U.S. Individual Income Tax Return for the year 2008 reflects a total available income of $28,965.00 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-three of the Verification Affidavit.

324.   For 2008, expenditures were identified through financial records relating to loan payments in the amount of $40,014.59.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $5,360.14. Considering these amounts of expenditures and the total available income for 2001 as stated above, Price's net available income totals negative <$16,409.73>.  This investigation is ongoing and additional expenditures are expected to be identified.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-four of the Verification Affidavit.

325.   Price's U.S. Individual Income Tax Return for the year 2009 reflects a total available income of $32,792.00 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds he may have received during the year.

Response:      FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-five of the Verification Affidavit.

326.   For 2009, expenditures were identified through financial records relating to loan payments in the amount of $38,814.51.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $2,121.95. Considering these amounts of expenditures and the total available income for 2001 as stated above, Price's net available income totals negative <$8,144.46>.  This investigation is ongoing and additional expenditures are expected to be identified.

      Response:     FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-six of the Verification Affidavit.

327.    To date, there has been no 2010 U.S. Individual Income Tax Return filed by Price.  In keeping with methods utilized in prior years, Form W-2 filed with the Internal Revenue Service relating to Price, and prior year income tax refund  reflect net wages after payroll deductions in the amount of  $94,184.00.

      Response:     FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-seven of the Verification Affidavit.

328.    For 2010, expenditures were identified through financial records relating to loan payments in the amount of $100,652.36.  Other expenditures relating to items such as telephone, utilities, and insurance were identified and computed to be $4,505.30.  Considering these amounts of expenditures and the total available income for 2010 as stated above, Price's net available income totals negative <$10,973.66>.  This investigation is ongoing and additional expenditures are expected to be identified.

      Response:     FAIN is unable to answer with certainty the allegations in paragraph three-hundred-twenty-eight of the Verification Affidavit.

## Overview of Fain's Income and Expenditures

329.    Fain's U.S. Individual Income Tax Return for the year 2005 reflects a total available income of  $57,406.49 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds or payments she may have received or paid during the year.

      Response:     FAIN admits the allegations in paragraph three-hundred-twenty-nine of the Verification Affidavit.

330.    For 2005, expenditures were identified through financial records relating to loan principle

payments in the amount of $8,553.29.  Considering these expenditures and the total

available income for 2005 as stated above, Fain's net available income totals $48,853.20.

This investigation is ongoing and additional expenditures are expected to be identified.

     <u>Response</u>:        FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-thirty of the Verification Affidavit, because she is unsure of net

available income and accuracy of IRS calculations – therefore denied.

331.    Fain's U.S. Individual Income Tax Return for the year 2006 reflects a total available

income of  $35,349.25 after considering payroll expenses and all deductions claimed on

schedules included with the tax return, as well as any income tax refunds or payments she

may have received or paid during the year.

     <u>Response</u>:        FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-thirty-one of the Verification Affidavit, because she is unsure of

net available income and accuracy of IRS calculations – therefore denied.

332.    For 2006, expenditures were identified through financial records relating to loan principle

payments in the amount of $11,707.24.  Considering these amounts of expenditures and

the total available income for 2006 as stated above, Fain's net available income totals

$23,642.01.  This investigation is ongoing and additional expenditures are expected to be

identified.

     <u>Response</u>:        FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-thirty-two of the Verification Affidavit, because she is unsure of

net available income and accuracy of IRS calculations – therefore denied.

333.    Fain's U.S. Individual Income Tax Return for the year 2007 reflects a total available

income of  $55,948.20 after considering payroll expenses and all deductions claimed on

schedules included with the tax return, as well as any income tax refunds she may have

received during the year.

    Response:    FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-thirty-three of the Verification Affidavit, because she is unsure

of net available income and accuracy of IRS calculations – therefore denied.

334.    For 2007, expenditures were identified through financial records relating to loan principle

payments in the amount of $11,801.28.  Considering these amounts of expenditures and

the total available income for 2007 as stated above, Fain's net available income totals

$44,146.92.  This investigation is ongoing and additional expenditures are expected to be

identified.

    Response:    FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-thirty-four of the Verification Affidavit, because she is unsure

of net available income and accuracy of IRS calculations – therefore denied.

335.    Fain's U.S. Individual Income Tax Return for the year 2008 reflects a total available

income of  negative <$24,814.00> after considering payroll expenses and all deductions

claimed on schedules included with the tax return, as well as any income tax refunds or

payments she may have received or paid during the year.

    Response:    FAIN is unable to answer with certainty the allegations in

paragraph three-hundred-thirty-five of the Verification Affidavit, because she is unsure of

net available income and accuracy of IRS calculations, and is unsure of the specific

question – therefore denied.

336.  For 2008, expenditures were identified through financial records relating to loan principle payments in the amount of $11,239.18.  Considering these amounts of expenditures and the total available income for 2008 as stated above, Fain's net available income totals negative <$36,053.18>.  This investigation is ongoing and additional expenditures are expected to be identified.

> <u>Response</u>:       FAIN is unable to answer with certainty the allegations in paragraph three-hundred-thirty-six of the Verification Affidavit, because she is unsure of net available income and accuracy of IRS calculations – therefore denied.

337.  Fain's U.S. Individual Income Tax Return for the year 2009 reflects a total available income of  $5,710.00 after considering payroll expenses and all deductions claimed on schedules included with the tax return, as well as any income tax refunds or payments she may have received or paid during the year.

> <u>Response</u>:       FAIN is unable to answer with certainty the allegations in paragraph three-hundred-thirty-seven of the Verification Affidavit, because she is unsure of net available income and accuracy of IRS calculations – therefore denied.

338.  For 2009, expenditures were identified through financial records relating to loan principle payments in the amount of $7,172.69.  Considering these amounts of expenditures and the total available income for 2009 as stated above, Fain's net available income totals negative <$1,462.69>.  This investigation is ongoing and additional expenditures are expected to be identified.

> <u>Response</u>:       FAIN is unable to answer with certainty the allegations in paragraph three-hundred-thirty-eight of the Verification Affidavit, because she is unsure of net available income and accuracy of IRS calculations – therefore denied.

339.    To date, there has been no 2010 U.S. Individual Income Tax Return filed by Fain.  In keeping with methods utilized in prior years, Form W-2 and other information returns filed with the Internal Revenue Service relating to Fain, and prior year income tax refund, reflect net wages after payroll deductions in the amount of $48,195.00.

   Response:    FAIN is unable to answer with certainty the allegations in paragraph three-hundred-thirty-nine of the Verification Affidavit, because she is unsure of net available income and accuracy of IRS calculations – therefore denied.

### Fain and MMS Overdrafts

340.    A review of financial records pertaining to Fain and MMS reveals a large amount of charges for overdraft fees and insufficient funds.

   Response:    FAIN admits the allegations in paragraph three-hundred-forty of the Verification Affidavit.

341.    For the period 2005 through 2011, Fain's business (MMS) and personal accounts combined reflect more than 400 instances of bank fees relating to insufficient funds.

   Response:    FAIN admits the allegations in paragraph three-hundred-forty-one of the Verification Affidavit.

342.    For the period 2005 through 2011, charges to Fain's personal and business accounts totaled approximately $7,000.00 and $5,500.00, respectively.

   Response:    As to the allegations in paragraph three-hundred-forty-two of the Verification Affidavit, FAIN states this was her way of having another manager of her accounts. Although it was costly, it was effective in ensuring all her supplies and accounts were paid on time. Fain states she does need to improve in this area, but it works for her and continues to work for her even today.

343.    Affiant believes these charges reflect and confirm that Fain did not have any ownership

interest in large sums of cash stored in the safe of Price or anywhere else.

Response:        FAIN denies the allegations in paragraph three-hundred-forty-three

of the Verification Affidavit, as to all of that Affiant's beliefs on this case.

## CONCLUSION

344.    Affiant submits that the above facts and circumstances support a reasonable belief that

the Government will be able to meet its burden of proof at a civil trial on this matter to

show that the Defendant properties of $229,590.00 in United States currency seized from

a safe in the home of Dallas County Commissioner John Wiley Price and $230,763.47

from Dallas County Commissioner John Wiley Price's sale of 7001 Grady Niblo Road,

Dallas Texas are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and

981(a)(1)(C).  The properties have been involved in a multi-faceted conspiracy involving,

Price, Fain, and others whereby they conspired to commit money laundering and to

engage in monetary transactions in property derived from specified unlawful activity in

violation of 18 U.S.C. § 1956(h) and conspiracies[2] to violate 18 U.S.C. § 152

[Bankruptcy Fraud] and 18 U.S.C. § 666 [Theft or Bribery Concerning Programs

Receiving Federal Funds].  Moreover, Price, Fain, and others have used their legitimate

sources of income to hide and disguise this money laundering by commingling their

legitimate income with their illegal income so that their legitimate income is now

substantially involved in the conspiracy to commit money laundering and to engage in

monetary transactions in property derived from specified unlawful activity.

---

[2]  Presently, the investigation shows that this is a single multi-faceted conspiracy and that there are only "conspiracies" in the sense that multiple laws against criminal conspiracies have been violated.

Response:     FAIN denies the allegations in paragraph three-hundred-forty-four of the Verification Affidavit, as to all of that Affiant's beliefs on this case.

345.   Affiant further believes the foregoing facts support a reasonable belief that Price and Fain conspired to enable Price to knowingly and fraudulently make false oaths in relation to his bankruptcy case while concealing the existence and/or true nature of ownership by Price of property that should have been included in Price's bankruptcy estate which Price and his conspirator(s) converted to different forms while his bankruptcy proceedings were still pending thereby defrauding or attempting to defraud his creditors, the bankruptcy court, title companies, and banks.

Response:     FAIN denies the allegations in paragraph three-hundred-forty-five of the Verification Affidavit, as to all of that Affiant's beliefs on this case.

346.   The facts and circumstances recited in this affidavit also support a reasonable belief that Price corruptly solicited or demanded for the benefit of other persons connected to him to accept and agree to accept items of value of $5,000.00 or more from persons and entities having business before Dallas County while intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of Dallas County.

Response:     FAIN denies the allegations in paragraph three-hundred-forty-six of the Verification Affidavit, as to all of that Affiant's beliefs on this case.

Respectfully submitted,

_____/s/ *Thomas W. Mills, Jr.*___
THOMAS W. MILLS, JR.
State Bar No. 14167500
MILLS & WILLIAMS, L.L.P.
Premier Place, Suite 980
5910 N. Central Expressway
Dallas, Texas 75206-5141
tmills@millsandwillilams.com
(214) 265-9265
(214) 363-3167 (facsimile)

ATTORNEYS FOR DEFENDANT


## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of October, 2012, I electronically filed the foregoing instrument, using the ECF system of this Court.  A copy of this instrument is being provided to all counsel of record via the ECF system of the court.


_____/s/ *Thomas W. Mills, Jr.*___
THOMAS W. MILLS, JR.